IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THOMAS MORRIS, on behalf of<br>and as Executor of the Estate of<br>Amy F. Morris, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:12-CV-1020-WKW |
| | ) | LEAD CASE |
| TRUST COMPANY OF VIRGINIA,<br>*et al.*, | ) | [WO] |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | | |
| GEORGE MASON UNIVERSITY<br>FOUNDATION, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:13-CV-930-WKW |
| | ) | MEMBER CASE |
| THOMAS W. MORRIS, *et al.*, | ) | [WO] |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The facts of these cases give new meaning – even double entendre – to the tired cliché "where there's a will, there's a way."  And "the way" is a seemingly endless trail of "nomadic controversies," with litigants roving from one court to another.  *First Tenn. Bank N.A. Memphis v. Smith*, 766 F.2d 255, 259 (6th Cir. 1985).  Why litigate perpetually across jurisdictions?  Because "[t]he defense of res

judicata is universally respected, but actually not very well liked." *Riordan v. Ferguson*, 147 F.2d 983, 988 (2d Cir. 1945) (Clark, J., dissenting).

Decedent Amy Falcon Morris executed two wills – one in 1998, and another in 2007. The 1998 Will left almost everything to George Mason University Foundation in Virginia. The 2007 Will left everything to Amy's family. In 2008, during her lifetime, a Virginia court ruled that Amy's 2007 Will was null and void because she lacked the capacity to execute it. When she died in Alabama in 2011, her son, Thomas W. Morris, was undeterred by the Virginia Court's ruling. He successfully petitioned an Alabama court to probate the 2007 Will, which survived, at least in Alabama, uncontested and unscathed. The Virginia court *later* probated the 1998 will that was, in its view and according to its prior ruling, the only valid one.

These are but two cases in a series of legal proceedings in Virginia, Alabama, and Maryland spanning eight years concerning Amy, her Estate, or her children's rights concerning the same. There are now competing state court orders, estates, executors, and beneficiaries, and this is the seventh federal court opinion in two districts. A large portion, if not all, of Amy's Estate has been consumed in attorneys' and conservator's fees, and the parties persist in litigation. Presently their disputes are over the viability of two sorts of claims: actions to collect on monetary judgments imposed by a Virginia state court against Amy's children

during prior litigation, and tort claims by the children, Mr. Morris and his sister, Sharon Duncan, against their opponents in that prior litigation.

First, George Mason University Foundation, Inc. (hereinafter "the Foundation") seeks to collect two separate Virginia monetary judgments against Mr. Morris and Ms. Duncan arising directly out of Mr. Morris and Ms. Duncan's dealings with Amy's assets during the pendency of the guardianship and conservatorship proceedings in a Virginia Court. This is the basis of the member case which originated in the Eastern District of Virginia.[1]

Second, Mr. Morris and Ms. Duncan raise tort claims against their long-time legal nemeses – the Trust Company of Virginia (hereinafter "the Trust Company"), which was appointed conservator of Amy's estate during her last years, and the Foundation, the named residual beneficiary under the 1998 Will.[2] Mr. Morris raises tort claims on behalf of Amy's Estate in the lead case, but in the member

---

[1] In this district's parlance, "lead case" and "member case" are terms used to identify two or more cases that have been consolidated by court order. A lead case is typically the older case and is designated as the place where case filings continue to be docketed. A member case is a non-lead case. Documents filed prior to consolidation remain on the docket of the member case.

[2] Additional tort claims against Karen Loulakis – the attorney who drafted the 1998 Will, advocated against Mr. Morris and Ms. Duncan during conservatorship and guardianship proceedings in Virginia, and probated the 1998 Will after Amy died – have been dismissed due to this court's lack of personal jurisdiction over Ms. Loulakis. (*See* Lead Case Doc. # 71.)

case, Mr. Morris and Ms. Duncan, in their individual capacities, have lodged counterclaims against the Foundation.[3]

There are four pending dispositive motions in the cases. Before the court in the lead case are two motions to dismiss Mr. Morris's Amended Complaint, filed by the Trust Company and the Foundation. (Lead Case Docs. # 34, 37.) The motions to dismiss have been fully briefed. (*See* Lead Case Docs. # 35, 38, 41, 45, 46.) Before the court in the member case are cross motions for summary judgment between the Foundation (Member Case Docs. # 51, 52) and Mr. Morris and Ms. Duncan (Member Case Docs. # 48, 55). Each side responded to the other's motion. (Member Case Docs. # 54, 60.) The court has also received supplemental briefing and submissions for the record to solidify the parties' positions concerning full faith and credit. (Lead Case Docs. # 86, 87, 89, 93, 94, 95, 97.)

## I. JURISDICTION AND VENUE

Subject-matter jurisdiction is proper pursuant to 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000, and there is complete diversity of

---

[3] Mr. Morris and Ms. Duncan also attempted to implead tort claims against the Trust Company in the member case, but those claims were dismissed as improperly impleaded under Rule 14 of the Federal Rules of Civil Procedure. (*See* Lead Case Doc. # 72.)

citizenship between the opposing parties in each case.[4]  No party disputes personal

jurisdiction or venue.[5]

## II.  STANDARDS OF REVIEW

### A.  <u>Motion to Dismiss for Failure to State a Claim</u>

When evaluating a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6), the court must take the facts alleged in the complaint as true

and construe them in the light most favorable to the plaintiff.  *Resnick v. AvMed,*

*Inc.*, 693 F.3d 1317, 1321–22 (11th Cir. 2012).  To survive Rule 12(b)(6) scrutiny,

"a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[F]acial

plausibility" exists "when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).

---

[4] Mr. Morris is a citizen of Alabama; Ms. Duncan is a citizen of Maryland; and the Trust Company and the Foundation are citizens of Virginia.

[5] Ms. Duncan, who is a party in the member case only, is now represented by Mr. Landis Sexton, Alabama counsel who has represented Mr. Morris in the lead case.  When defending the member case in Virginia, Ms. Duncan unsuccessfully requested transfer of the member case to this court.  (*See* Member Case Docs. # 5, 44.)  And when the Trust Company of Virginia moved again to transfer the case to this district, Ms. Duncan did not oppose the motion.  (Member Case Doc. # 91 (opposing a motion to dismiss but not an alternative motion to transfer to this district).)  Ms. Duncan has not objected, through Mr. Sexton or otherwise, to this court's exercise of personal jurisdiction over her.

A defendant may raise the plaintiff's lack of capacity to sue under a Rule 12(b)(6) motion to dismiss.  *See Graca v. Rosebank Mar., Inc.*, No. 04-14302, 2005 WL 6458603, at *2 (11th Cir. Mar. 8, 2005); *see also Klebanow v. N.Y. Produce Exch.*, 344 F.2d 294, 296 n.1 (2d Cir. 1965) ("Although the defense of lack of capacity is not expressly mentioned in rule 12(b), the practice has grown up of examining it by a 12(b)(6) motion when the defect appears upon the face of the complaint.").  Generally, when a district court "considers materials outside of the complaint, [it] must convert the motion to dismiss into a summary judgment motion," but "[i]n ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged."  *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010).  A district court may thus take judicial notice of documents in legal proceedings which are public records that are "not subject to reasonable dispute" and "capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned."  *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010) (quoting Fed. R. Evid. 201(b)).

## B.   <u>Motion for Summary Judgment</u>

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the evidence and

the inferences from that evidence in the light most favorable to the nonmovant. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id*. Or a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the movant meets its burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists. *Celotex*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

# III. BACKGROUND

This opinion is the court's third and final one in a trilogy.  Abbreviated facts and procedural history have been set out in two prior opinions (Lead Case Docs. # 71, 72), but a full account of the facts is necessary to give context to the remaining claims and defenses.  When considering the pending motions, the court will view the allegations or evidence as required by the applicable standard of review.  When necessary, judicial notice will be taken of documents admitted, allegations pleaded, and decisions rendered in prior court proceedings in various Virginia and Alabama state and federal courts.[6]  These judicial facts are relevant to the parties' arguments concerning full faith and credit of state court orders and the application of preclusion law.

## A.    Facts

Amy Falcon Morris died testate in Montgomery, Alabama, in March 2011.  Amy's first will was prepared in 1998 by Ms. Loulakis, an attorney from Virginia, while Amy lived in Virginia.  No one disputes that Amy had the requisite mental capacity to devise the 1998 Will.  The 1998 Will named Ms. Loulakis as the Executor of Amy's Estate and named the Foundation as the residual beneficiary of

---

[6] A court may take judicial notice of documents filed in another court not for the truth of the matters asserted within the documents, but for the purpose of establishing the existence of other litigation and the judicial actions undertaken in orders.  *See United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).

the Estate.  Mr. Morris and his family members were basically disinherited by their mother in that will.[7]

On February 22, 2007, Amy was in a car wreck in Virginia Beach, Virginia. Afterward, she was admitted to Chesapeake General Hospital.  Shortly after the accident, Mr. Morris and Ms. Duncan filed an action in the Circuit Court of Virginia Beach, Virginia (hereinafter "the Virginia Court"), in which they sought to be appointed as Amy's guardians and conservators.  In their amended petition for appointment of guardian and conservator, filed April 10, 2007, Mr. Morris and Ms. Duncan, with the assistance of counsel, represented to the Virginia Court that Amy "suffers from dementia of Alzheimer's type with psychosis.  Her dementia has progressed to the point that she does not recognize [Mr. Morris and Ms. Duncan] and cannot communicate in complete sentences with them."  (Member Case Doc. # 52-3, at ¶ 6.)  Mr. Morris and Ms. Duncan further averred that Amy was "physically and mentally incapacitated" and there was no indication that she would recover from her disability.  (Member Case Doc. # 52-3, at ¶ 7.)

On April 27, 2007, during the pendency of the guardianship and conservatorship proceedings, Mr. Morris had Amy discharged from Chesapeake General Hospital.  On May 2, 2007, Mr. Morris moved Amy into a residential nursing facility in Montgomery, Alabama.  The Foundation represents that Mr.

---

[7] The 1998 Will provides for a $1,000 gift to Ms. Duncan and a $20,000 gift to Mr. Morris.  (Member Case Doc. # 52-11, at 3.)

Morris and Ms. Duncan moved their mother without court approval and against the advice of medical care providers, but Mr. Morris and Ms. Duncan say that Amy wanted to move (*see* Member Case Doc. # 49, at 16, ¶ 9), that the court had notice beforehand, and that the *guardian ad litem* appointed to represent Amy, Charles Johnson, approved.[8]  Mr. Morris and Ms. Duncan further assert that a document conferring power of attorney upon Mr. Morris was "located, validated[,] and filed" with the Virginia Court.  (Lead Case Doc. # 88, at 3.)

On April 27, 2007, Ms. Loulakis moved to intervene in the Virginia guardianship and conservatorship proceedings and asserted that Amy's interests differed from Mr. Morris and Ms. Duncan's interests.  (Lead Case Doc. # 93-2, at 29.)  Allegedly at the prompting of Ms. Loulakis, the Foundation intervened on or around May 20, 2007, based on its understanding that it would be the residual beneficiary of Amy's Estate under the 1998 Will.  On May 23, 2007, Judge A. Bonwill Shockley, the presiding judge in the Virginia Court proceedings, appointed Ms. Loulakis as Amy's counsel in the proceedings and permitted the Foundation's intervention in the case.  (*See* Lead Case Docs. # 93-2, at 32–33.)

---

[8] *When* Mr. Johnson approved of the move to Alabama is unclear.  It is clear that by October 2007, after visiting Montgomery, Mr. Johnson believed Amy's placement in the facility in Montgomery was "a good choice."  (Lead Case Doc. # 93-3, at 78.)

Ms. Loulakis's appointment was distinct from the continued representation of Amy by Mr. Johnson, the *guardian ad litem*.[9]

On May 5, 2007, shortly after arriving in Montgomery, Amy executed a deed of gift transferring her Virginia Beach home, as well as her Smith Barney stock accounts worth roughly $1.6 million, to Mr. Morris and Ms. Duncan. Montgomery Attorney Mark Chambless witnessed and notarized the deed of gift. Mr. Chambless reportedly referred Amy to another Montgomery law firm for the drafting of a new will. Montgomery Attorney Lee Hamilton drafted a new will for Amy, which Amy executed on May 25, 2007. The 2007 Will names Mr. Morris the Executor of Amy's Estate and makes Mr. Morris, Ms. Duncan, and their families the beneficiaries of the Estate. Mr. Morris and Ms. Duncan represent that the 2007 Will was drafted and executed according to Amy's wishes. About the same time, Mr. Morris and Ms. Duncan listed Amy's Virginia Beach house for sale because she would not be returning to Virginia.

Mr. Morris and Ms. Duncan filed a competing action in the Probate Court of Montgomery County, Alabama (hereinafter the "Alabama Probate Court") to be appointed as Amy's guardian and conservator. The Alabama Probate Court stayed its proceedings pending the outcome of the Virginia Court guardianship and

---

[9] Mr. Morris and Ms. Duncan have alleged that Judge Shockley is partial to the Foundation because she is an alumna of George Mason University School of Law. They requested that Judge Shockley recuse herself, but she declined. Judge Shockley continued to preside over all of the Virginia Court proceedings described *infra*.

conservatorship proceedings, and it appears that the Alabama conservatorship and guardianship proceedings never resumed.

In Virginia, Mr. Morris and Ms. Duncan filed a "Notice" declaring their intent to move for a nonsuit or voluntary dismissal of their petition pursuant to Virginia statute. (Lead Case Doc. # 93-3, at 113.) No formal motion for nonsuit was filed. On May 30, 2007, the Foundation informed the Virginia Court that it would oppose dismissal of the case and that it would file an answer, counterclaim, and crossclaim. (Lead Case Doc. # 93-3 at 102–03, 115–23.) The Foundation's countersuit sought an accounting from Mr. Morris and Ms. Duncan. During a hearing on June 8, 2007, the court ruled from the bench that Mr. Morris and Ms. Duncan's oral motion for nonsuit was denied. (Lead Case Doc. # 93-3, at 56.)

The same date, the court entered an order enjoining the parties from transferring or disposing of any of Amy's assets. (*See* Lead Case Doc. # 93-3 at 126 (prohibiting Mr. Morris and Ms. Duncan from "making any distributions, by exercise of authority under any power of attorney or otherwise, out of [Amy's] assets other than distributions for those costs directly related to [her] care.").) The Foundation alleges that Mr. Morris and Ms. Duncan violated the Virginia Court's injunction by wrongfully transferring Amy's property, including financial accounts and her Virginia Beach home, to themselves. However, the June 8, 2007 order was

entered after the property transfers of May 5, 2007, and after the execution of the will on May 25, 2007.

Ms. Loulakis, in her capacity as Amy's appointed attorney, came to Amy's nursing home facility in Montgomery in July 2007, allegedly with a forged order from Montgomery County Probate Judge Reese McKinney authorizing her visit to see Amy.   Mr. Morris and Ms. Duncan claim that Amy was alert and communicated her wishes that Ms. Loulakis and the Foundation cease meddling in her affairs.   According to Mr. Morris and Ms. Duncan, Ms. Loulakis lied to the Virginia Court, saying that Amy was unresponsive to inquiries when Ms. Loulakis tried to question her.   Mr. Morris and Ms. Duncan claim further that Montgomery Attorney Ed Parish witnessed Ms. Loulakis's visit with Ms. Morris, but Judge Shockley refused to hear Mr. Parish's testimony.[10]   The Foundation has rebutted Mr. Morris and Ms. Duncan's representations by showing the transcript of Mr. Parish's limited testimony in Virginia.  (Lead Case Doc. # 94-7.)   The transcript explains that the Virginia Court sustained the Foundation's objection to Mr. Parish's testimony and restricted him from testifying against Ms. Loulakis because he participated in the act of secretly and illegally taping a live conversation on July 28, 2007, involving Ms. Loulakis, without her awareness or consent.

---

[10] Mr. Parish's affidavit was presented later to the Circuit Court of Montgomery County in a different proceeding.  (Lead Case Doc. # 93-3, at 141–42.)

On February 29, 2008, after receiving testimony and evidence during a trial, the Virginia Court entered orders retroactively declaring Amy to be an incapacitated person as of February 22, 2007, appointing Mr. Morris as Amy's guardian only, and appointing the Trust Company as conservator of her property. (Lead Case Doc. # 35-1, at 19–20, ¶¶ A, G.)[11]   The Virginia Court found that Amy's incapacity was perpetual and that she would not improve.  (Lead Case Doc. # 35-1, at 17, ¶ 7.)   The Virginia Court also relieved Amy of her authority to perform legal acts, and significantly, the order declared that the 2007 Alabama Will was "invalid and of no effect."  (Lead Case Doc. # 35-1, at 20–21, ¶ L.)  The Virginia Court declared all transfers of Amy's assets after February 22, 2007, void *ab initio* and directed Mr. Morris and Ms. Duncan to convey to the Trust Company Amy's assets that they had transferred to themselves by power of attorney or other documents executed by Amy in Alabama.  (Lead Case Doc. # 35-1, at 22, ¶¶ Q–R.)[12]

On August 8, 2008, the Virginia Court held a hearing and found by clear and convincing evidence that Mr. Morris and Ms. Duncan had "acted in bad faith since the Feb. 29, 2008, final decree, and . . . deliberately failed to fully comply with the

---

[11] The court and the parties sometimes have referred to this order as the "leap year order." The same critical document is in the member case record as Document # 52-4.

[12] The Foundation represents that Mr. Morris and Ms. Duncan appealed the leap year order to the Virginia Supreme Court, which denied their request for a writ and for rehearing. (*See* Member Case Doc. # 41, at ¶¶ 22–23.)

14

June 8, 2007 injunction and order, and the Feb. 29, 2008 final decree, including, but not limited to, failing to return the assets that they took from Amy . . . to the Conservator."  (Lead Case Doc. # 93-2, at 38.)   For that reason, the court found Mr. Morris and Ms. Duncan in contempt and issued a capias order as to both of them.  (Lead Case Doc. # 93-2, at 38–41.)   The capias order appears to still be in effect.

On December 19, 2008, the Virginia Court entered a final judgment against Mr. Morris and Ms. Duncan, jointly and severally, and in favor of the Trust Company as Conservator for Amy in the amount of $1,125,222, plus interest. (Lead Case Doc. # 35-1, at 38, ¶ 13.)[13]   The same order included a "separate final judgment in the amount of $100,000" against Mr. Morris and Ms. Duncan, "jointly and severally, in favor of the Foundation, with interest at the legal rate until paid, as that portion of attorney's fees and costs of the Foundation . . . attributable to" Mr. Morris and Ms. Duncan's contempt of court.  (Lead Case Doc. # 35-1, at 38, ¶ 10(d).)   It is undisputed that Virginia's appellate courts denied Mr. Morris and Ms. Duncan's appeals of the judgments against them.  (*See* Member Case Docs. # 52-5, 52-7, 52-8 (letters from the Virginia Court of Appeals and the Virginia Supreme Court).)   Mr. Morris and Ms. Duncan complain that the judgment is

---

[13] The final judgment against Mr. Morris and Ms. Duncan is in the record, attached to the Foundation's amended complaint as Doc. # 41-2 in the member case.

based on inflated and unaudited sums of assets, but it is a valid judgment nonetheless.

On January 9, 2009, the Trust Company filed the Virginia Court's judgment in the Circuit Court of Montgomery County, Alabama.  The Foundation was joined as an indispensable party.  Mr. Morris responded by filing a motion for relief pursuant to Rule 60(b)(4) of the Alabama Rules of Civil Procedure.  (Lead Case Doc. # 93-1.)   In the motion, Mr. Morris asserted that the Foundation lacked standing to intervene in the Virginia case once Amy executed her 2007 Will.  Mr. Morris argued the judgment was void because the Virginia Court lacked jurisdiction over the Foundation's claims and further that the Virginia Court lost jurisdiction when he and Ms. Duncan exercised their statutory right to a nonsuit. (Lead Case Doc. # 93-3, at 8–11.)   On May 25, 2010, after receiving thorough briefing, the Circuit Court of Montgomery County denied Mr. Morris's Rule 60(b) motion.[14]

Mr. Morris complains that under the Virginia Court's conservatorship arrangement, the Trust Company ultimately received $990,000 in assets belonging to Amy.[15]  Mr. Morris claims that $302,000 of that sum was spent on Amy's care,

---

[14] The Trust Company brings this to the court's attention to show that many of Mr. Morris's jurisdictional objections have been raised, considered, and dismissed in previous litigation.

[15] This sum apparently includes $154,441 transferred to the Trust Company from an IRA, $290,840 from a Smith Barney account in Mr. Morris's and Amy's names, $168,690 from a

while the remainder was allegedly squandered, handled incompetently, or spent on attorneys' fees.  Mr. Morris complains that the Trust Company failed to sell Amy's house for its full value and unnecessarily incurred large tax penalties by liquidating an IRA.[16]  He also claims that the Foundation interfered with his attempt to sell Amy's home by wrongfully filing a *lis pendens* action against the property, defeating a sale on terms more favorable to Amy than the contract the Trust Company later negotiated.[17]  Mr. Morris alleges that the Trust Company and the Foundation then "cover[ed] their tracks" by expending several hundreds of thousands of dollars of Amy's money, during her lifetime, on their attorneys' fees. (Lead Case Doc. # 29, at ¶ 40.)

In 2010, Mr. Morris, purportedly acting as Amy's "attorney-in-fact," filed a satisfaction of judgment in Montgomery County Circuit Court, releasing himself from liability on the $1,125,222 judgment.  The Foundation moved to strike the satisfaction in the pending suit to domesticate the Virginia judgment, but it appears

---

Smith Barney account in Ms. Duncan's and Amy's names, and $242,525 from the sale of Amy's house.  (*See* Member Case Doc. # 49, at 22–24, ¶¶ 43, 46, 49, 50.)  It is not completely clear what other assets of Amy's came under the Trust Company's control.

[16] The Trust Company represents that after petitioning the Virginia Court for "aid and guidance" as conservator of Amy's property, the court authorized the sale of Amy's home.  (*See* Lead Case Doc. # 35-1, at 51 (April 8, 2010 order granting the Trust Company "the authority to sell the Residence at such a price and on such terms as it determines will result in a sale of the Residence as soon as practicable.").)

[17] Specifically, Mr. Morris and Ms. Duncan claim that they entered a contract to sell the house in February 2008 for $319,000.  The Trust Company later sold the house for $242,525.

that the motion was not decided.   Amy died on March 25, 2011, and the domestication suit was dismissed.  (*See* Member Case Doc. # 55-6.)

After Amy died, Mr. Morris initiated probate proceedings of the 2007 Will in the Alabama Probate Court, notwithstanding the Virginia Court's 2008 determination that Amy lacked the capacity to devise the 2007 Will.  On April 7, 2011, the Alabama Probate Court probated Amy's will and issued certified letters testamentary to Mr. Morris as Executor of the Estate.  (Lead Case Doc. # 41-1, at 1.)  Necessarily, the Alabama Probate Court found that Amy was an inhabitant of Montgomery County, Alabama, at the time of her death, that she was "of . . . sound mind and disposing memory and understanding" when she signed the will, that the court was "satisfied as to its jurisdiction," and that Thomas Morris was "in no way disqualified from serving" as executor.  (Lead Case Doc. # 97-1, at 11.)  None of the Virginia parties – Ms. Loulakis, the Foundation, or the Trust Company – was given legal notice of the proceedings.  Neither did any of those parties appear on their own initiative in Alabama to contest the 2007 Will.  On May 19, 2011, the Alabama Probate Court ordered the Trust Company to release to Mr. Morris all funds belonging to Amy.  (Lead Case Doc. # 41-1, at 3.)  Mr. Morris claims that when he contacted the Trust Company after Amy's death, it refused to relinquish the Estate's funds to him unless he and Ms. Duncan released their *personal* claims against it.  The Trust Company allegedly told Mr. Morris that it

would consume the remainder of the Estate in litigation expenses if Mr. Morris did not comply.  (*See* Lead Case Doc. # 29, at ¶¶ 44–45; Member Case Doc. # 49, at 27, ¶ 67.)

Mr. Morris never received the remainder of Amy's Estate.  Upon the Trust Company's petition for a writ of prohibition or other appropriate relief from the Alabama Supreme Court, that court concluded that the Trust Company was never properly served with process or provided adequate notice of the Alabama Probate Court's proceedings and that the Alabama Probate Court lacked personal jurisdiction over the Trust Company.  *Ex parte Trust Co. of Va.*, 96 So. 3d 67, 68 (Ala. 2012).  The Alabama Supreme Court directed the probate judge to vacate his prior orders that required the Trust Company to transfer conservatorship assets to Mr. Morris and that enjoined the Trust Company from disbursing assets without court approval.  *Id.* at 70.

By an order dated July 20, 2012, the Alabama Probate Court denied as moot Mr. Morris's "Second Petition to Compel Release of Trust Funds" because the Trust Company had already distributed Amy's assets pursuant to the orders of the Virginia Court, and the Trust Company's administration of the conservatorship of Amy's Estate was complete.  (*See* Lead Case Doc. # 41-1, at 5.)  Indeed, although Mr. Morris had presented the 2007 Will for probate in Alabama, proceedings were also ongoing in Virginia, where the Trust Company filed an interpleader action

concerning the disposition of about $106,000 held by it and remaining in Amy's Estate because of Mr. Morris's and Ms. Loulakis's competing claims to represent Amy's Estate.

The Virginia Court admitted the 1998 Will to probate in August 2011.  The Virginia Court found, based on its prior rulings in 2008, that Virginia remained Amy's legal domicile at the time of her death because she lacked the capacity to change her domicile.  (*See* Member Case Doc. # 52-12, at ¶¶ 3, 6.)  It consequently appointed Ms. Loulakis – not Mr. Morris – as the Executor of Amy's Estate.  (*See* Member Case Doc. # 52-12, at ¶ C.)  Mr. Morris and Ms. Duncan were parties to the interpleader and probate proceedings in Virginia in 2011, along with the Foundation and Ms. Loulakis, (Doc. # 52-12, at ¶ 1), and Mr. Morris and Ms. Duncan did not appeal the Virginia court's interpleader or probate orders.

Pursuant to an order of the Virginia Court on October 27, 2011, the Trust Company assigned to Ms. Loulakis the December 19, 2008 judgment against Mr. Morris and Ms. Duncan and in favor of Amy, and paid over or delivered all other remaining assets in the Estate to Ms. Loulakis.  On November 26, 2012, Ms. Loulakis, in her capacity as Executor, executed an Instrument of Assignment conveying to the Foundation all of the Estate's interest in the December 19, 2008 judgment in the amount of $1,125,222 against Mr. Morris and Ms. Duncan.  (*See* Member Case Doc. # 41-3.)

Mr. Morris alleges that Ms. Loulakis failed to protect Amy's assets, both before and after Amy's death, and that she and the Trust Company proceeded to oppose Mr. Morris in the Virginia interpleader suit, in spite of their knowledge of Mr. Morris's first-in-time appointment as Executor of Amy's Estate in the Alabama Probate Court.

## B.   **Procedural History**

### 1.   *Lead Case Proceedings*

Mr. Morris sued the Trust Company, the Foundation, and Ms. Loulakis in the Circuit Court of Montgomery County, Alabama, on October 19, 2012.  The Trust Company removed the case to federal court.  (Lead Case Doc. # 1.)  Both the Foundation and the Trust Company filed motions to dismiss the complaint for failure to state claims against them.  (Lead Case Docs. # 8, 9.)

The court entered a memorandum opinion and order granting in part and denying in part the Trust Company and the Foundation's motions to dismiss the original complaint.  (Lead Case Doc. # 28.)  The court concluded that Mr. Morris could not sue the three defendants for torts committed against Amy because the torts did not survive her death, or for torts against himself because he abandoned those claims by failing to respond to the motions to dismiss those claims.  (Lead Case Doc. # 28, at 5–7.)  This left only the tort claims against Amy's Estate, but the original complaint failed to develop the facts adequately to give the lead case

defendants notice of which torts they allegedly committed against the Estate.  (*See* Lead Case Doc. # 28, at 7.)  Consequently, the court struck the original complaint and directed Mr. Morris to file an amended complaint.  Mr. Morris complied on May 27, 2013, but the amended pleading still blurs the lines and conflates alleged torts against Amy with alleged torts against the Estate.  (*See* Lead Case Doc. # 29.)

Mr. Morris's amended complaint raises seven counts, of which the following five remain before the court: (1) Count One against the Trust Company for breach of fiduciary duty; (2) Count Two against the Trust Company for conversion; (3) Count Three against the Foundation for interference with contractual relations; (4) Count Four for conversion against the Foundation; (5) Count Seven against the Trust Company and the Foundation for civil conspiracy.[18]  Before the court are motions to dismiss the amended complaint in its entirety.  (Lead Case Docs. # 34, 37.)

### 2.    *Member Case Proceedings*

On December 21, 2011, the Foundation filed suit against Mr. Morris and Ms. Duncan in the Eastern District of Virginia to enforce the Virginia Court's judgment in its favor for $100,000, plus interest.  (Member Case Doc. # 1.)  Mr. Morris and Ms. Duncan sought to dismiss the case, or alternatively, to transfer the

---

[18] Mr. Morris also raised three claims against Ms. Loulakis (Counts Five, Six, and Seven), which have been dismissed for lack of personal jurisdiction.

case to this district.  (Member Case Docs. # 5, 6.)[19]   The Eastern District of Virginia denied their motions on April 11, 2012.  (Member Case Doc. # 10.)[20]

On August 19, 2013, with leave of that court, the Foundation amended its complaint to add a claim to enforce the $1,125,222, plus interest, judgment in favor of Amy, which Ms. Loulakis, as Executor, assigned to the Foundation as the beneficiary under the 1998 Will.  (*See* Member Case Doc. # 41.)   Again, Mr. Morris and Ms. Duncan filed a motion to dismiss, or alternatively, to transfer the case to this district.  These motions were denied.  Not long thereafter, Mr. Morris and Ms. Duncan filed a motion for summary judgment on the Foundation's claims, which remains pending.  (Member Case Doc. # 48.)  The Foundation opposes the motion.  (Member Case Doc. # 54.)

Mr. Morris and Ms. Duncan then filed an answer to the amended complaint with counterclaims against the Foundation.  (Member Case Doc. # 49.)[21]   The pending counterclaims of Mr. Morris and Ms. Duncan include:   (1) Count III against the Foundation for conspiracy; (2) Count VI against the Foundation for

---

[19] From the outset and until November 2013, Mr. Morris and Ms. Duncan represented themselves in the member case without counsel.

[20] Mr. Morris and Ms. Duncan appealed the denial of their motion to dismiss, and the Fourth Circuit Court of Appeals dismissed their appeal for lack of jurisdiction.  (*See* Member Case Doc. # 16.)

[21] The answer also lodged "crossclaims," actually third-party claims, against the Trust Company and Ms. Loulakis.  Those claims have been dismissed.  (*See* Lead Case Docs. # 71, 72.)

breach of fiduciary duty; (3) Count VII against the Foundation for wanton breach of fiduciary duty; (4) Count VIII against the Foundation for conversion; (5) Count IX against the Foundation for abuse of process; and (6) Count X against the Foundation for tortious interference with expectancy of inheritance.  Mr. Morris and Ms. Duncan seek millions of dollars in compensatory and punitive damages. (Member Case Doc. # 49, at 41.)[22]

On October 3, 2013, the Foundation filed a motion for summary judgment on its two claims against Mr. Morris and Ms. Duncan and on all counterclaims against it (*i.e.*, Counts III, VI, VII, VIII, IX, and X).  (Member Case Doc. # 51, 52) Mr. Morris and Ms. Duncan oppose the motion and request summary judgment in their favor on the six counterclaims.  (Member Case Doc. # 60.)  Their opposition

---

[22] The tort claims pending in the lead case are not identical to the tort claims pending in the member case.  At this juncture in the lead case, Mr. Morris stands only "on behalf of and as Executor for the Estate of Amy F. Morris." (Lead Case Doc. # 36, at 1.)  Even if Mr. Morris had not re-pleaded his amended complaint as he did, the court dismissed the claims he filed on behalf of himself as abandoned or as failing to state a claim under Alabama law. (*See* Lead Case Doc. # 28, at 6–7 & n.4.)  In the member case, which this court has yet to address, Mr. Morris and Ms. Duncan raise their counterclaims "in [their] individual capacit[ies]."  (Member Case Doc. # 49.) Mr. Morris and Ms. Duncan assert that their member case counterclaims should be allowed to proceed in the consolidated action because Ms. Duncan is new to the Alabama litigation, and further, because "Mr. Morris and Ms. Duncan could not have known and could not have asserted" their counterclaims "until [the Foundation] made its judgment claims against Mr. Morris and Ms. Duncan individually." (Lead Case Doc. # 52, at 2–3.)  It is true that this court has yet to consider Ms. Duncan's claims against the Foundation, but it is false that Mr. Morris was unable to raise personal counterclaims until the Foundation amended the member case complaint and added a count to collect the $1,125,222 judgment against him.  Mr. Morris's counterclaims are based on the same facts on which Mr. Morris based his lead case individual capacity claims in 2012.  However, the court will not belabor the issue because the resolution of the counterclaims turns on the Foundation's defenses of res judicata and collateral estoppel. *See* infra Part IV.C.4.

brief contains a request for judgment in their favor on their counterclaims. The parties' cross motions for summary judgment remain pending.

### 3.  *Transfer to the Middle District of Alabama and Consolidation*

On November 15, 2013, the Trust Company filed a motion to dismiss the third-party claims against them, or alternatively, to transfer venue to this district. (*See* Member Case Docs. 86, 87, 88, 89.) Mr. Morris and Ms. Duncan opposed the Trust Company's motion to dismiss. (Member Case Doc. # 91.) The Eastern District of Virginia granted the Trust Company's Motion to Transfer Venue to this court on December 9, 2013, pursuant to 28 U.S.C. § 1404(a), without ruling on the alternative motion to dismiss.[23] (*See* Member Case Docs. # 92, 93.) After the Eastern District of Virginia transferred the member case to this district, the two actions were consolidated on January 30, 2014, upon the Trust Company's motion and after finding that consolidation was the simplest and most expeditious way of resolving these proceedings. (*See* Lead Case Doc. # 57.)

The court asked the parties to disclose any other pending cases concerning the underlying judgment, decrees, or claims. It learned that an action to collect one or both judgments against Ms. Duncan is pending in the Circuit Court for Harford County, Maryland, case number 12-cv-09-088. (*See* Lead Case Docs. # 52, 54, 55,

---

[23] The transferring court did not receive briefing from all of the other parties before transferring the action, and Ms. Loulakis in particular was unable to assert her opposition to transfer on the grounds that Alabama's courts lack personal jurisdiction over her.

56.)  Ms. Duncan and the Trust Company were the original parties to that case, but the Trust Company says it is no longer a party because, on December 20, 2012, the Maryland Court of Special Appeals substituted Ms. Loulakis for the Trust Company.  (*See* Lead Case Doc. # 56-1.)  Ms. Loulakis is apparently no longer a party either.  (Lead Case Doc. # 54.)  The court deduces that the action is now being litigated by the Foundation, as Ms. Loulakis's assignee of the $1,125,222 judgment.  (Lead Case Doc. # 55.)  Mr. Morris and Ms. Duncan represent that the Maryland case has been stayed pending resolution of this litigation.  (Lead Case Doc. # 52, at 3.)  As will be discussed *infra*, Mr. Morris attempted to satisfy the domesticated Maryland judgment against his sister, but the satisfaction was set aside.

On September 26, 2014, the court dismissed all claims in both cases against Ms. Loulakis for lack of personal jurisdiction.  (Lead Case Doc. # 71.)  The same day, the court granted the Trust Company's motion to dismiss all third-party claims of Mr. Morris and Ms. Duncan in the member case.  (Lead Case Doc. # 72.)  The court ordered additional briefing from the parties concerning the Virginia Court's authority to invalidate Amy's 2007 Will during her lifetime, the full faith and credit due to Virginia's order appointing Ms. Loulakis as executor of Amy's Estate, and the abatement of any breach of fiduciary duty claims against the Trust Company.   (Lead Case Doc. # 73.)   The parties responded by submitting

26

supplemental briefing.  (Lead Case Docs. # 86, 87, 89.)  On December 2, 2014, oral argument was held on the pending dispositive motions, (*see* Lead Case Doc. # 92), and per the court's requests, second supplemental briefs, court documents, and evidence have been filed.  (Lead Case Docs. # 93, 94, 95, 97.)

## IV.  DISCUSSION

The claims before the court cannot be resolved by recognizing both Mr. Morris and Ms. Loulakis's rights to serve as the representative of Amy's Estate. Hence, the discussion will begin with an inquiry into whether Alabama or Virginia's probate proceedings are entitled to full faith and credit.   All other arguments supporting the parties' pending motions to dismiss and for summary judgment, which are necessary to the resolution of the issues in the cases, will then be addressed.

## A.    **Mr. Morris's Capacity to Sue and to Defend Suit as Executor or Beneficiary Under the 2007 Will**

The court is mindful of the "well-settled proposition that a federal court will not assume jurisdiction over a petition whose object is to avoid a will or set aside its probate." *Moore v. Graybeal*, 670 F. Supp. 130, 131 (D. Del. 1987) *aff'd*, 843 F.2d 706 (3d Cir. 1988).  "[A] federal court has no jurisdiction to probate a will or administer an estate," and must not "interfere with the probate proceedings or assume general jurisdiction of the probate or control of the property in the custody

27

of the state court." *Markham v. Allen*, 326 U.S. 490, 494 (1946).  In the present scenario, wills have been proven and probate administrations in each state are completed.  There is no estate property left (save the $1,125,222, judgment, which has been assigned to the Foundation) over which to assume control.  No party to these cases has come to court seeking equitable or declaratory relief – for instance, asking for a judicial determination of which of two wills, admitted to probate in Alabama and Virginia, is the true last will and testament of Amy.  *Cf. Eyber v. Dominion Nat'l Bank of Bristol Office,* 249 F. Supp. 531 (W.D. Va. 1966) (refusing to exercise jurisdiction where complaint sought declaratory relief).  While it could be argued that this court is being asked, in effect, to set aside the probate of one of Amy's two wills, the court has before it several non-probate, legal claims and defenses that require the court to grant or deny full faith and credit to prior probate orders.  Even if the claims and defenses before this court had been brought in a state court, a state court would be pressed to resolve the question of full faith and credit.

A fundamental ground for dismissal of Mr. Morris's amended complaint in the lead case is his alleged lack of capacity as Executor to sue on behalf of Amy's Estate.  The issue of capacity is also pertinent to resolving the Foundation's second claim for $1,125,222 in the member case.  The quandary created by the probate of competing wills was acknowledged prior to the transfer of the member case from

the Eastern District of Virginia.  (*See* Member Case Doc. # 58, at 15 ("[T]he jurisdiction of the Virginia Beach Circuit Court to probate [Amy]'s 1998 Will is in question in light [of] collateral proceedings in the state of Alabama.  Alabama and Virginia state courts each appear to have recognized different Executors to [Amy]'s [E]state under separate wills.  As such, there is a question as to which state court should be accorded full faith and credit regarding their jurisdictional findings and probate of [Amy]'s respective wills.").)

The Foundation argues that because the Virginia Court ruled before Amy died that Amy's 2007 Will was invalid, and because the Virginia Court also ruled, after Amy's death, that Ms. Loulakis – not Mr. Morris – is the Executor of Amy's Estate, Mr. Morris lacks the capacity to sue on behalf of Amy's Estate.  (*See* Lead Case Docs. # 36, at 13–14 (arguing that Mr. Morris lacks standing), 22–23 (requesting that full faith and credit be given to the Virginia Court's rulings); # 38, at 7 (adopting the same arguments).)  The argument is really Ms. Loulakis's, but the Foundation has adopted it as its own.  The Trust Company never has taken a position on which will is valid,[24] but agrees that if the 2007 Will is invalid, Mr. Morris lacks the capacity to sue.  (Lead Case Doc. # 35, at 3 n.1.)  The parties denominate this as an issue of whether Mr. Morris has "standing" to sue, but there is no discussion of Article III standing.  This appears actually to be a question of

---

[24] In its words, it "ha[s] a duty of impartiality regarding the disposition of [Amy's] assets."  (Lead Case Doc. # 87, at 3.)

Mr. Morris's "capacity" to sue.  *See State v. Property at 2018 Rainbow Drive*, 740 So. 2d 1025, 1027–28 (Ala. 1999) (discussing differences between the principles of "real party in interest" and "standing"); *see also Ex parte Tyson Foods, Inc*., 146 So. 3d 1041, 1049 (Ala. 2013) (Shaw, J., concurring) ("'Standing' and 'capacity' are two distinct issues . . . .").

The Foundation is correct that "[a]n action filed on behalf of an estate must be brought by the executors."  *Douglass v. Jones*, 628 So. 2d 940, 941 (Ala. Civ. App. 1993); *see also* Ala. Code § 43-2-833(c) ("Except as to proceedings which do not survive the death of the decedent, a personal representative of a decedent domiciled in this state at death has the same standing to sue and be sued in the courts of this state and the courts of any other jurisdiction as the decedent had immediately prior to death.").  But deciding whether Mr. Morris is an executor with the capacity to bring this action is complicated by the existence of orders of Alabama and Virginia courts that recognize different executors of Amy's Estate. Mr. Morris acknowledges the conundrum.  (Lead Case Doc. # 41, at 4–5.)

In the October 17, 2014 Order requesting supplemental briefing, this court asked the parties to offer legal arguments why it must refuse to recognize either order appointing Mr. Morris or Ms. Loulakis as executor or executrix.  (Lead Case Doc. # 73.)   The Trust Company remains neutral, but the Foundation and Mr. Morris responded.

### 1.    *Proffered Reasons to Deny Full Faith and Credit*

Federal courts are bound by statute to extend full faith and credit to "[t]he records and judicial proceedings of any [state] court."  28 U.S.C. § 1738.  The Foundation and Mr. Morris each contend that the probate order relied upon by the other should be denied full faith and credit.  Their arguments focus on undermining the subject-matter jurisdiction of the Virginia or Alabama courts because a state court's judgment "relied upon as the basis of a claim or defense in a later action in another forum may be avoided" if the state court rendering the judgment lacked subject-matter jurisdiction.  Restatement (Second) of Judgments § 81 (1982); *see also* Restatement (Second) of Conflict of Laws §§ 104, 105 (1971); *Underwriters Nat'l Assur. Co. v. N.C. Life & Acc. & Health Ins. Guar. Ass'n*, 455 U.S. 691, 704–05 (1982) ("[A] judgment of a court in one State is conclusive upon the merits in a court in another State only if the court in the first State had power to pass on the merits – had jurisdiction, that is, to render the judgment.  Consequently, before a court is bound by the judgment rendered in another State, it may inquire into the jurisdictional basis of the foreign court's decree.  If that court did not have jurisdiction over the subject matter or the relevant parties, full faith and credit need not be given." (internal citation and quotation marks omitted)).  This court should resolve the jurisdictional basis for the relevant prior orders.  *See Harbuck v. Marsh Block & Co.*, 896 F.2d 1327, 1329 (11th Cir. 1990) ("Federal courts must inquire

into the jurisdictional basis of a state court judgment before according it full faith and credit.").

### a.   Mr. Morris's Opposition to Virginia's Jurisdiction

Mr. Morris offers two reasons for refusing to extend full faith and credit to the Virginia Court's order appointing Ms. Loulakis as executrix.

### i.   Improper Denial of Nonsuit

The ultimate outcome in Virginia in 2011 – *i.e.*, the probate of the 1998 Will – depended upon the Virginia Court's proper exercise of subject-matter jurisdiction over proceedings initiated in 2007.  Mr. Morris contends that the Virginia Court lacked authority to proceed with the guardianship and conservatorship proceedings in 2007 because he and Ms. Duncan petitioned for a nonsuit under Va. Code Ann. § 8.01-380, which is similar to Rule 41(a)(1)(A)(i)'s provision for the plaintiff's voluntary dismissal of an action prior to the defendant's service of an answer or motion for summary judgment.  *See* Fed. R. Civ. P. 41(a)(1)(A)(i).  Section 8.01-380(D) provides that

> [a] party shall not be allowed to nonsuit a cause of action, without the consent of the adverse party who has filed a counterclaim, cross claim or third-party claim which arises out of the same transaction or occurrence as the claim of the party desiring to nonsuit unless the counterclaim, cross claim or third-party claim can remain pending for independent adjudication by the court.

Virginia case law states that "a plaintiff has an absolute right to one nonsuit" that "neither the trial court nor opposing counsel can prevent him from" obtaining.

*Nash v. Jewell*, 315 S.E.2d 825, 829 (Va. 1984).  Further, after a party exercises the right to a nonsuit, the court is deprived of jurisdiction over the matter.  *Lewis v. Culpeper Cnty. Dep't of Soc. Servs.*, 647 S.E.2d 511, 515 (Va. 2007) *overruled on other grounds by Davis v. Cnty. of Fairfax*, 710 S.E.2d 466 (Va. 2011).  Hence, Mr. Morris contends that the Virginia Court lacked authority to invalidate the 2007 Will, recognize the 1998 Will notwithstanding the 2007 Will, and appoint Ms. Loulakis as Executrix.

Records confirm that the Foundation filed an answer, counterclaim, and crossclaim on May 30, 2007.  (Lead Case Doc. # 93-3, at 115–123.)  Five days earlier on May 25, 2007, Mr. Morris and Ms. Duncan's counsel mailed the Virginia Court a "notice" that they intended to petition for nonsuit (Lead Case Docs. # 93-3, at 113; 95-1, at 6–7), but there is no record that they actually filed a motion until they did so orally in court in June 2007.  The Virginia Court did not document receipt of the notice until May 30, 2007, the same day that the Foundation formally filed its answer and counterclaim.  The Virginia Court summarily denied nonsuit.

Mr. Morris and Ms. Duncan represent that they petitioned a Virginia appellate court for mandamus concerning Judge Shockley's denial of the nonsuit (Lead Case Doc. # 88, at 5), but they apparently were denied relief.  The record reflects that the allegedly wrongful denial of a nonsuit was raised as an argument

on appeal, (Lead Case Doc. # 94-1, at 5), and it is undisputed that Mr. Morris and Ms. Duncan did not prevail in that appeal.[25]   Thus, Mr. Morris fails to show the untimely filing of his motion for nonsuit deprived the Virginia Court of jurisdiction to continue with the guardianship and conservatorship proceedings that he and Ms. Duncan initiated in 2007.  The nonsuit argument is a non-starter.

ii.     Lack of Jurisdiction in 2008 to Invalidate the 2007 Will

Mr. Morris also asserts that this court should refuse to extend full faith and credit to the Virginia Court's orders because that court lacked jurisdiction in 2008 to invalidate the 2007 Will during Amy's lifetime.[26]   Under Virginia law – and probably every other state's law – a will has no effect until the death of the testator.  *See Timberlake v. State-Planters Bank of Commerce & Trusts*, 115 S.E.2d 39, 44 (Va. 1960) ("A will is an ambulatory instrument, not intended or allowed to take effect until the death of the maker.  It may be changed during life as often as the mind and purpose of the testator change.  While he lives his written will has no life

---

[25] The Circuit Court of Montgomery County also denied Mr. Morris's motion for relief from the enrollment of the Virginia Court judgment that was based on the same argument.  (*See* Lead Case Doc. # 93-4, at 2.)

[26] The court raised this issue in its order requesting supplemental briefing, but Mr. Morris and Ms. Duncan first raised it themselves, *pro se*, in the member case.  (*See* Member Case Docs. # 60, at 3 ("It is widely accepted . . . pursuant to the Uni[form] Probate Code that a [w]ill has no legal effect until it is probated."); # 44, at 7 ("Judge Shockley had neither the authority nor jurisdiction to make such a declaration since Amy . . . was still living" in 2008.).)  A judgment is entitled to full faith and credit even when the court rendering the judgment committed a mistake of law; any error alleged must undermine jurisdiction.  *Milliken v. Meyer*, 311 U.S. 457, 462 (1940).  To be clear, Mr. Morris and Ms. Duncan contend that the Virginia Court had no jurisdiction to determine the validity of any will prior to Amy's death.

34

or force, and is not operative or effective for any purpose.").[27]   Moreover, in Virginia, "[t]he issue of whether or not a testator had mental capacity to make a particular will can be rendered res judicata in a probate proceeding and in no other proceeding." *Eyber*, 249 F. Supp. at 533.

In defense of the Virginia Court's action, the Foundation has alluded to several "broad powers" that justified the Virginia Court's action, including its general statutory authority to conduct guardianship and conservatorship proceedings and the equitable doctrine of *parens patriae*, which obliged the court to look after Amy's interests.   (*See* Lead Case Doc. # 89, at 8–14.)   But the Foundation is unable to produce statutory authorization or case law precedent for the Virginia Court's action because, unsurprisingly, neither exists.   The Foundation argues that this court must abide by the Virginia Supreme Court's "interpretation" of Virginia law, (Lead Case Doc. # 89, at 10), but this court has no "interpretation" from the Virginia Supreme Court that authorizes the invalidation of a will during the testator's life.[28]   The Virginia Court's "invalidation" of an ambulatory will was

---

[27] This is basic first year – even first century – law.   Indeed, the irony that death breathes life into a last will and testament may be universally understood.   Hebrews 9:16–17 (King James) puts it this way, albeit in an entirely different context:   "For where a testament is, there must also of necessity be the death of the testator.   For a testament is of force after men are dead: otherwise it is of no strength at all while the testator liveth."

[28] The record evidence does not clearly show that Mr. Morris and Ms. Duncan raised the ambulatory will issue to the Virginia Supreme Court on appeal or that the Virginia Supreme Court ever actually reviewed that issue.   (*See* Lead Case Docs. # 94-1, 94-2, 94-3; Member Case Docs. # 52-7, 52-8.)

improper, on par with a court awarding a party title to the North Pole.  It is not to be recognized as preclusive of anything.[29]

The Foundation's best argument is its "so what?" position articulated during oral argument in this action.  (*See* Lead Case Doc. # 92, at 19–23.)  There, the Foundation asserted that even if the Virginia Court lacked jurisdiction to invalidate the 2007 Will in its order on February 29, 2008, the Virginia Court had jurisdiction, when probating the 1998 Will on August 12, 2011, to rely on its previous factual finding that Amy was *incapacitated* in 2007 and therefore incapable of executing a valid will in May 2007.  In other words, the Virginia Court *had jurisdiction* in 2011 to determine the validity of the 2007 Will when the Virginia Court rejected it, along with Mr. Morris's Alabama appointment as executor, during the 2011 Virginia probate proceedings.  (*See* Member Doc. # 52-12 at ¶ 6.)

Mr. Morris responds in his second supplemental brief that Virginia law does not permit a court conducting probate proceedings to adopt or apply findings from non-probate proceedings.  (Lead Case Doc. # 95, at 6–7 (citing *Tate v. Chumbley*, 57 S.E.2d 151 (Va. 1950)).)  In *Tate*, the Supreme Court of Virginia considered the

---

[29] The intervention in conservatorship proceedings of a potential beneficiary under an ambulatory will is also irregular, as is the process by which confidential communications between Ms. Loulakis and Amy regarding the 1998 Will were divulged to the Virginia Court by Ms. Loulakis.  But those issues were not presented in this case.

effect upon a will contest of the testatrix's former adjudication of insanity.  The proponents of an earlier will pleaded res judicata, contending that the testatrix had been legally adjudged insane by different tribunals prior to the date that she executed a second will.  *Id.* at 156.  The court reasoned that the courts that adjudicated the testatrix insane "lacked the *power and jurisdiction* to determine whether or not this testatrix then or at any other time had testamentary capacity," "[n]or did they undertake so to decide."  *Id.* at 157 (emphasis added).  Because "neither tribunal was concerned with whether [the testatrix] enjoyed periods of normalcy or lucid intervals of greater or less duration," no prior adjudication of insanity could "as a matter of law, be used to estop [the proponent of the second will] from offering the will for probate."  *Id.*

> The *Tate* court then declared that
>
> an interested party may have the actual mental capacity of a testator to make a will factually decided . . . , and that right cannot be foreclosed by estoppel of record or rendered *res adjudicata* in any judicial or quasi-judicial proceeding to which such interested person may be a party other than by one of probate.  *The issue of whether or not a testator had mental capacity to make a particular will can be rendered* res adjudicata *in a probate proceeding and none other*.

*Id.* (emphasis added); *see also Eyber*, 249 F. Supp. at 533.  Focusing on the emphasized sentence, Mr. Morris argues that "[t]he Virginia Court could not properly use its prior order in the conservatorship as a basis for its . . . order appointing Ms. Loulakis executrix, because Virginia does not permit non-probate

proceedings to have res judicata effect on probate proceedings." (Lead Case Doc. # 95, at 7.)

The quotation omits additional context. The point of the cited passage of *Tate* is to affirm the right of a will contestant to have the testator's mental capacity factually decided at the time of probate when the court is presented with two wills. The rule announced is that unless there has been a prior *probate* adjudication of the testator's mental capacity, no other determination of mental capacity can be used to preclude factual inquiry of testamentary capacity. But, according to *Tate*, such prior non-probate adjudications of insanity "*constitute and must be regarded as prima facie evidence of testamentary incapacity* of the party adjudged insane." 57 S.E.2d at 158 (emphasis added). The prior adjudication, even in the face of a lack of jurisdiction to decide the issue in the prior proceedings vis-à-vis an ambulatory will, is evidence sufficient to establish a presumption of testamentary incapacity, but is insufficient to be conclusive. The contestant must overcome that presumption of incapacity. *Id.*

Hence, *Tate* did not forbid the Virginia Court from considering its prior judicial determination of incapacity made in non-probate proceedings when rejecting the 2007 Will on the grounds of incapacity in the 2011 probate proceedings. *Tate* only bars a court from giving preclusive effect to the issue of testamentary capacity. It would be legal error if the Virginia Court conclusively

precluded in its 2008 order any future probate challenge to or discussion of the issue of Amy's testamentary capacity.  However, the legal error (*i.e.*, giving the 2008 decree preclusive effect in 2011, if that is in fact what the Virginia Court did in the 2011 probate proceeding) would not undercut the Virginia Court's probate *jurisdiction*.  *See Milliken*, 311 U.S. at 462.  Importantly, Mr. Morris makes no argument that the Virginia Court lacked *jurisdiction* in 2011 to probate the 1998 Will and to appoint Ms. Loulakis as executrix.

There can be little doubt the Virginia Court was looking after the Foundation's interests, but there is considerable doubt as to whether Amy's interests mattered at all.  The Virginia Court overreached – perhaps wittingly – on February 29, 2008, by attempting to preemptively crush a future will contest.  Unfortunately, the Virginia Court, rather than clarifying the rights of the parties before it, fostered confusion and distrust.  Nevertheless, it falls on this court to bring finality to the dispute.  Accordingly, the court accepts the Foundation's "so what" argument and finds that however wrong the Virginia Court was in 2008 or 2011, those errors had no impact upon the Virginia Court's jurisdiction to probate the 1998 Will and to in effect reject the 2007 Will and its executor in August 2011. The lack of success on appeal of the February 29, 2008 ruling in Virginia further solidifies the preclusive effect of the Virginia proceedings.

### iii.   Lack of Integrity or Fairness of the Virginia Courts

Mr. Morris and Ms. Duncan say that the Virginia Court denied them "a fair opportunity to litigate [their] rights and defenses . . . prior to the judgment being assessed" against them, "thereby warranting equitable relief" from the monetary judgment against them.  (Member Case Doc. # 48, at 3.)[30]  They assert this court has the discretion to refuse to recognize a judgment "rendered in circumstances that raise substantial doubt about the integrity of the rendering court."  (Member Case Doc. # 60, at 2.)  They propose that the court may refuse to extend full faith and credit to a judgment where the judgment was tainted by "partiality, bribery, or lack of fairness."  (Member Case Doc. # 60, at 3.)  Additionally, Mr. Morris and Ms. Duncan assert that Virginia's appellate courts never heard the merits of their appeal of the Virginia Court's judgment.  (Member Case Doc. # 60, at 4.)

Mr. Morris and Ms. Duncan cite no authority in support of their arguments that this court can refuse to give full faith and credit because of alleged unfairness or corruption in the Virginia Court.  A federal court should not give preclusive effect to a state court judgment "when the party against whom the earlier decision is asserted did not have a full and fair opportunity to litigate [a] claim or issue."  *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 480–81 (1982) (internal quotation

---

[30] Unlike the prior two arguments, Mr. Morris and Ms. Duncan raised this argument *pro se* in the member case briefing at summary judgment, rather than with the assistance of counsel in response to the court's requests for supplemental briefing in October and December 2014.

marks omitted).  "Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation," but "state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause in order to qualify for the full faith and credit guaranteed by federal law."  *Id.* at 481.

In *Walker v. R.J. Reynolds Tobacco Co.*, 734 F.3d 1278, 1286 (11th Cir. 2013), the Eleventh Circuit noted that the inquiry allowed by *Kremer* is narrow – *i.e.*, to decide only whether giving a state court decision preclusive effect would deprive the objecting party of due process.  *Id.* at 1287.  The *Walker* panel noted that a federal court's task is not to decide whether the state court decision was correct as a matter of state law.  *Id.* (citing *Am. Ry. Express Co. v. Kentucky*, 273 U.S. 269, 273 (1927)).  A "full and fair opportunity" is simply an opportunity to be heard and to contest liability.  *Id.* at 1288 (citing *Richards v. Jefferson Cnty., Ala.*, 517 U.S. 793, 797 n.4 (1996)).

In accordance with that standard, the court finds that Mr. Morris and Ms. Duncan had the opportunity to be heard in Virginia Court during the guardianship and conservatorship proceedings that they themselves initiated.  Mr. Morris and Ms. Duncan likewise had the opportunity to contest their culpability for contempt of court and the amount of assets belonging to Amy that they failed to return to Amy's conservatorship estate.  Before both the February 29, 2008 order finding

Mr. Morris and Ms. Duncan liable to the Foundation and before its entry of final judgment on December 19, 2008, the Virginia Court conducted a hearing and entertained arguments of counsel, including counsel for Mr. Morris and Ms. Duncan. The Virginia Court found Mr. Morris and Ms. Duncan in contempt of the court and its orders, and imposed a $100,000 judgment, with interest, against them and in favor of the Foundation for its fees and costs incurred. (Member Case Doc. # 52-6, at ¶ 10(d).) The court also found that Mr. Morris and Ms. Duncan were liable to Amy for $1,125,222, which was the amount of any shortfall of Amy's assets not turned over to the Trust Company. (Member Case Docs. # 52-6, at ¶ 13; 52-4, at ¶ R.3.)

As for Mr. Morris and Ms. Duncan's contention that Virginia appellate courts did not consider the merits of their appeals of the final judgment, there is no denying that Mr. Morris and Ms. Duncan were given the opportunity to appeal. To the extent that the merits of their appeal were not heard, they do not dispute that their opening brief with the Virginia Court of Appeals was untimely filed, or that they did not identify any error in the Virginia Court of Appeals' ruling dismissing their appeal. (Member Case Doc. # 52-7, 52-8 (letters from the Clerk of the Court of Appeals of Virginia and the Virginia Supreme Court explaining the reasons the appeals were denied without opinions).)

Mr. Morris and Ms. Duncan have not offered a legitimate reason for this court to refuse to extend full faith and credit to the Virginia court's order appointing Ms. Loulakis as Executrix of Amy's Estate or the Virginia court's monetary judgments against Mr. Morris and Ms. Duncan.

### b.      The Foundation's Opposition to Alabama's Jurisdiction

Like Mr. Morris and Ms. Duncan, the Foundation has its own legal obstacles.  It faces the potential preclusive effect of a facially valid will probate in Alabama which preceded the Virginia probate proceedings.  The Foundation offers two reasons why the Alabama Probate Court's 2011 order appointing Mr. Morris executor, entered prior to the probate of the 1998 Will in Virginia, should be denied full faith and credit by this court.

### i.      The Foundation Not a Party to Alabama Proceedings

The Foundation first asserts that it was not a party to the Alabama probate proceedings and is "thus not bound by that court's ex parte orders."  (Lead Case Doc. # 89, at 15.)  The Foundation offers *Riley v. New York Trust Company*, 315 U.S. 343, 353–54 (1942), in support of its proposition that "parties are bound by the results of litigation to which they are parties, and are not bound by litigation to which they are not."  (Lead Case Doc. # 89, at 16.)[31]

---

[31] The Foundation also relies on *Overby v. Gordon*, 177 U.S. 214 (1900), and *National Savings & Trust Co. v. Herrick*, 112 So. 2d 191 (Ala. 1958), in support of the same principle.

In contrast to the Foundation's lack of notice of the Alabama probate proceedings, Mr. Morris and Ms. Duncan were parties to both the guardianship proceedings in 2008 in which the Virginia Court determined that Amy lacked mental capacity and to the probate proceedings in 2011 that relied upon the 2008 findings.   (*See* Member Case Doc. # 52-12, at ¶ 1.)   The Foundation further represents that Mr. Morris and Ms. Duncan failed to inform the Alabama Probate Court of the Virginia Court's prior adjudication of Amy's permanent incapacity or of the substantial judgment entered against them and in favor of Amy, facts which the Foundation says likely would have influenced the outcome in the Alabama Probate Court.

Under Alabama law, interested parties may contest the probate of a will during probate proceedings in the probate court or within six months after probate by filing a complaint in circuit court.   *See* Ala. Code §§ 43-8-190, 43-8-199. Alabama law did not require Mr. Morris to provide notice to the Foundation or Ms. Loulakis that he petitioned to probate the 2007 Will in Alabama.   *Cf.* Ala. Code §§ 43-8-164–166 (requiring notice to surviving spouse and next of kin only). Alabama law did require Mr. Morris to give notice of his appointment to "all persons having claims against the estate" by first class mail and by publication, *id.* §§ 43-2-60–43-2-61, but the Foundation was not a creditor of Amy's Estate.

Therefore, the Foundation's argument that it was entitled to notice as an "interested party" (Lead Case Doc. # 94, at 7–8) lacks support in the Alabama statute.

Mr. Morris does not deny that he did not provide formal notice to the Foundation before the 2007 Will was probated.   Instead, he claims that the Foundation knew about the Alabama probate estate through the legal grapevine – especially, through separate interpleader proceedings in Virginia – and chose not to appear in Alabama to contest the 2007 Will.   Mr. Morris contends that the Foundation knew about Mr. Morris's appointment as executor no later than the date it was served with notice of the Virginia Interpleader suit, which was occasioned by the competing claims to the remainder of Amy's money.[32]   Mr. Morris also offers Attorney Ed Parish's affidavit testimony that he communicated to counsel for the Foundation that Amy's Estate had been probated in Alabama. (Lead Case Doc. # 95-2.)[33]

---

[32] The opinion of the Alabama Supreme Court cites April 28, 2011, as the date that the Trust Company filed the interpleader complaint.   *Ex parte Trust Co. of Virginia*, 96 So. 3d at 68. The record shows that the amended complaint for interpleader was filed on August 23, 2011 and named as a defendant Mr. Morris individually and as the personal representative of Amy's Estate.   (Lead Case Doc. # 9-6.)   Both dates were well within six months of Mr. Morris's appointment as Executor.

[33] There is a dispute as to whether the Foundation had informal notice of Alabama's probate proceedings.   Mr. Parish represents that the Foundation had notice of the probate of the 2007 Will in Alabama because the Trust Company filed a motion to vacate the Alabama Probate Court's order compelling the Trust Company to release the Estate's funds to Mr. Morris.   (Lead Case Doc. # 95-2, at ¶¶ 3–4.)   Mr. Parish also attests that he "personally communicated on multiple occasions with [c]ounsel [for the Foundation and the Trust Company,] and [he] can swear to this [c]ourt that they were aware than an Estate for Amy F. Morris had been

In *Riley*, the case upon which the Foundation relies, the Supreme Court affirmed the Delaware Supreme Court's holding that a Delaware court could determine a testatrix's domicile anew, notwithstanding a Georgia court's prior resolution that the testatrix was a domiciliary of Georgia.  315 U.S. at 347, 355.[34] *Riley* originated when Coca Cola filed an interpleader suit in Delaware, the situs of Coca Cola stock belonging to the testatrix, seeking a ruling as to whether a New York-appointed administrator or two Georgia-appointed executors were entitled to possess the certificates of stock.  *Id.* at 345–47.  Before the Supreme Court, the Georgia executors asserted that Georgia's prior "judgment on domicile conclusively establishe[d] the right of the Georgia executors to demand delivery" of the stock certificates.  *Id.* at 348.

The Supreme Court disagreed, citing the New York administrator's non-joinder as a party in the Georgia proceedings.  The Court announced that "[t]he full faith and credit clause allows [one state] in disposing of local assets to determine the question of domicile anew for any interested party who is not bound by participation in [another state's] proceeding."  *Id.* at 349–50.  The Court reasoned that "if the effect of a probate decree in Georgia *in personam* was to bar a stranger

---

established" in Alabama.  (Lead Case Doc. # 95-2, at ¶ 4.)  The Foundation disputes that it had notice.  The resolution of this case does not depend upon resolving this disputed fact.

[34] A thorough discussion of the legal import of domicile follows *infra*.  For now, it is enough to say that a testator's domicile typically determines which state's court will probate his or her will.

to the decree from later asserting his rights, such a holding would deny procedural due process." *Id.* at 354. The Court "admitted that this [allowance for] reexamination may result in conflicting decisions upon domicile, but that is an inevitable consequence of the existing federal system . . . ." *Id.* at 350.

Other courts have interpreted *Riley* as instructing that a state court's judgment is to be deemed inconclusive as to a testator's domicile where an interested party's rights were not represented in the state court's probate proceedings. *See, e.g.*, *In re Estate of Nye*, 299 N.E.2d 854, 859 (Ind. Ct. App. 1973). The Foundation asks this court to further infer from *Riley* a rule requiring a court to favor *inter partes* probate proceedings to *ex parte* probate proceedings when faced with competing and conflicting probate orders. (Lead Case Doc. # 89, at 19.) *Riley* does advise that the Virginia Court was entitled to decide facts anew because Ms. Loulakis and the Foundation were not parties to the Alabama Probate action – a different issue discussed *infra*. However, *Riley* simply does not instruct a federal forum to decline to extend full faith and credit to a state court probate order (here, the Alabama probate of the 2007 Alabama Will) simply because not everyone in the federal dispute was a party to the contested probate proceeding.

Further, it matters to this court that the Foundation chose not to challenge Mr. Morris's appointment as executor in Alabama, thereby spawning conflicting probate orders in two states (and the need for this opinion). Even though the

47

Foundation was not given formal legal notice of the Alabama petition, it is credibly disputed by Mr. Morris that the Foundation (and Ms. Loulakis) knew, during the six months following Mr. Morris's appointment as executor, about his Alabama appointment under the 2007 Will. They chose not to challenge it, probably for strategic reasons. For that additional reason, the court cannot agree that *Riley* requires it to favor Virginia's order over Alabama's. *Cf. Miniafee v. United States*, 17 Cl. Ct. 571, 576–77 (Fed. Cl. 1989) (distinguishing *Riley* factually for the reason that "the parties in *Riley* . . . did not have the opportunity to join or appeal the probate judgment" and rejecting the United States's argument that it was not bound by state probate proceedings to which it was not a party where the United States had notice and the opportunity to join but failed to do so).

ii.   Amy's Lack of Capacity to Change Her Domicile

As a second ground for declining full faith and credit, the Foundation asserts that the Alabama Probate Court lacked jurisdiction to probate the 2007 Will because Amy's incapacity from 2007 forward rendered her legally incapable of changing her domicile from Virginia to Alabama. (Lead Case Doc. # 94, at 5–7.) On this point, the Foundation gains traction.

A will is ordinarily probated in the state and county of the testator's domicile; this is the "primary" probate of a will. *See* 95 C.J.S. *Wills* § 550. But the presence of the testator's assets within some other state also furnishes that

state's courts with *in rem* jurisdiction over the property. Where the testator is domiciled in State A but dies leaving property located within State B, the usual method of establishing jurisdiction in State B would be by "ancillary" probate proceedings, *i.e.*, asking State B to recognize the probate proceedings in State A. *See* 95 C.J.S. *Wills* § 542.

Mr. Morris and Ms. Duncan allege that Amy changed her domicile from Virginia Beach to Montgomery when she consented to moving to Alabama in May 2007, (*See* Member Case Doc. # 49, at 16–17, ¶¶ 9, 12),[35] but the Foundation contends that Amy lacked the mental capacity to make that change and therefore never became domiciled in Alabama. Amy's maintenance of a Virginia domicile was one of the Virginia Court's stated grounds for not affording full faith and credit to Alabama's Probate Court order when it probated the 1998 Will and appointed Ms. Loulakis executrix of Amy's Estate. (Member Case Doc. # 52-12, at ¶ 6(b)(i).) If the Foundation and the Virginia Court are correct, the Alabama 2007 Will should have been probated in Virginia, not Alabama.

---

[35] Mr. Morris and Ms. Duncan also assert, in their *pro se* brief and counterclaim in the member case, that Amy "paid Alabama state income taxes" "for the last four years of her life." (Member Case Doc. # 60, at 2; *see also* Member Case Doc. # 49, at 26, ¶ 62.) Mr. Morris and Ms. Duncan cite a Supreme Court case, *Clay v. Sun Insurance Office, Ltd.*, 377 U.S. 179 (1964), for its purported support that "the rules of the new domicile apply," but that language is not in the *Clay* opinion, and Mr. Morris and Ms. Duncan offer no further explanation of their position. Further, *Clay* does not advise or even suggest that the payment of state income taxes proves a change in domicile.

For the Alabama Probate Court to accept the 2007 Will, Amy needed to be an Alabama domiciliary. Alabama law permits the probate of a will "in the probate court of such county" where "the testator, at the time of his death, was an inhabitant." Ala. Code § 43-8-162(1).[36] Jurisdiction in Alabama's probate courts must be based on one of the five statutory provisions. If a probate court lacks subject-matter jurisdiction, its orders are void, *Ingram v. Van Dall*, 70 So. 3d 1191, 1197 (Ala. 2011), and can be set aside on direct appeal or on collateral attack, *Ex parte James*, 713 So. 2d 869, 878 (Ala. 1997).

The Alabama Supreme Court historically has interpreted the statutory term "inhabitant" as having the same meaning as domiciliary. *See, e.g.*, *Merrill's Heirs v. Morrissett*, 76 Ala. 433, 437 (Ala. 1884) ("The word inhabitant has been defined to be one who has his domicil in a place, – one who has an actual fixed residence

---

[36] Alternatively, wills may be "proved" in Alabama's probate courts as follows:

(2) When the testator, not being an inhabitant of the state, dies in the county, leaving assets therein, in the probate court of such county.

(3) When the testator, not being an inhabitant of the state, dies out of the county, leaving assets therein, in the probate [court] of the county in which such assets, or any part thereof, are.

(4) When the testator, not being an inhabitant of the state, dies, not leaving assets therein, and assets thereafter come into any county, in the probate court of any county into which such assets are brought.

(5) In the probate court of the county designated by testator in the will if the testator owns property in such county at the time of his death.

Ala. Code § 43-8-162(2)–(5).

in a place.") (internal quotation marks and citation omitted); *Ambrose v. Vandeford*, 167 So. 2d 149, 150 (Ala. 1964) ("The word 'inhabitant' in the sense of this [probate] codal provision is synonymous with 'domiciliary.'"); *Taylor v. Estate of Harper*, ___ So. 3d ____, ____, 2014 WL 4798781, at *2 (Ala. 2014) ("This Court has equated the term 'inhabitant' with the word 'domiciliary,' and a domicile consists of a residence at a particular place accompanied by an intent to remain there permanently or for an indefinite length of time.").  If Amy was not an Alabama domiciliary, then the Alabama Probate Court lacked jurisdiction to probate the 2007 Will on the basis of § 43-8-162(1), the provision conferring jurisdiction where the testator dies an "inhabitant" of an Alabama county.

The Foundation represents that under both Virginia and Alabama law, changing one's domicile requires not only a change in physical presence but also the specific intent to change domicile.  *See Ex parte Weissinger*, 22 So. 2d 510, 514 (Ala. 1945) ("A person's domicile is that place in which his habitation is fixed, without any present intention of removing, and it embraces (1) the fact of residence and (2) the intention to remain."); *State-Planters Bank & Trust Co. of Richmond v. Commonwealth*, 6 S.E.2d 629, 631 (Va. 1940) ("Domicile means more than residence.  Domicile is residence at a particular place, accompanied by intention to remain there for an unlimited time.  Both residence and intention to remain there must concur to constitute domicile.").  A person can have only one domicile.  *Ex*

*parte Coley*, 942 So. 2d 349, 352 (Ala. 2006). Therefore, Amy either was or was not a domiciliary of Virginia when she died. Either the Virginia Court or the Alabama Probate Court was wrong about her intent to establish an Alabama domicile. *See Nora v. Nora*, 494 So. 2d 16, 18 (Ala. 1986) ("In determining whether or not there has been a change in domicile the intention of the person whose domicile is in question is usually the controlling consideration.").

The Foundation contends that in accordance with the Virginia Court's ruling in 2008 that Amy suffered, from the time of her 2007 accident, "complete mental incapacity" that was "perpetual and w[ould] not improve," (Lead Case Doc. # 35-1, at 16–17, ¶¶ 5–7), and further, that Amy had been "relieved of all authority and power to manage and perform legal acts with respect to her person and property," (Lead Case Doc. # 35-1, at 20, ¶ L), Amy lacked the mental capacity to change her domicile from Virginia to Alabama.

The Virginia Court's findings are supported by Virginia law. *See* Va. Code Ann. § 64.2-443 ("Where any person has become, either voluntarily or involuntarily, a patient in a nursing home, convalescent home, or similar institution due to advanced age or impaired health, the place of legal residence of the person shall be rebuttably presumed to be the same as it was before he became a patient."); *see also Commonwealth v. Kernochan*, 106 S.E. 367, 369 (Va. 1921) (holding that a person adjudicated insane and incompetent maintained the New

York domicile that she had prior to her incompetency adjudication, notwithstanding her subsequent, court-approved, physical relocation to Virginia). The *Kernochan* court explained that an incompetent person's domicile could not be changed during her incapacity except by "some competent agency and authority" – specifically, "her committee [that is, her guardian] and the courts having jurisdiction of her person and estate." *Id.* The court held that "a guardian or committee, other than one occupying the position of a parent, has no power to change his ward's domicile from one state to another" because "[s]uch a change . . . might materially impair or affect some of the substantial personal or property rights of the insane person, as well as the right of succession at his death." *Id.* at 370.[37]

---

[37] There are examples of cases outside Virginia that followed the rule articulated in *Kernochan*. In *Brown v. Brown*, 381 N.Y.S.2d 803, 805 (N.Y. Sup. Ct. 1976), the trial court concluded that a woman could not change her incompetent adult son's domicile simply by physically removing him from California to New York without receiving both a judicial appointment as his guardian *and* the approval of the California court that assumed jurisdiction over him and declared him incompetent. Similarly, in *In re Kassler*, 19 N.Y.S.2d 266, 269 (N.Y. Sup. Ct. 1940), the court, citing *Kernochan*, held that

> the guardian of the person and property of an individual [declared insane or incompetent] has the right, if acting in good faith on behalf of the [incompetent person], permanently to remove his or her ward to another jurisdiction. *That right, of course, is subject to the paramount supervision of the particular court which exercises an initial control over the incompetent person.*

(Emphasis added). The *Kassler* court reasoned that the judge originally exercising jurisdiction over the incompetent person's affairs had the discretion to deny a change of domicile – even where the incompetent person expressed a desire to relocate. "Irrespective of the wishes of the guardian, and even of the incompetent where there is some capacity for the expression of a choice, the court may nevertheless forbid and restrain a removal if it appear prejudicial to the welfare and interests of the afflicted person." *Id.* [continued on next page]

Whether Alabama law is in harmony with *Kernochan* is less clear.  In *Nora*,

Alabama Supreme Court Justice Beatty recognized that

> an adult person who has become a mental imbecile, or who has been
> judicially declared insane, *is incapable of a voluntary change of
> domicile*, and therefore retains the domicile which he had when he
> became insane, unless it is changed by some competent or authorized
> person or tribunal, or until the restoration of his sanity.

494 So. 2d at 18 (Beatty, J., dissenting) (quoting 28 C.J.S. *Domicile* § 12(e) at 27

(1941)) (emphasis added).  By comparison, a person of "partially unsound mind"

potentially could establish a new domicile.  *Id.*  The cited portion of the dissenting

opinion did not contradict the majority holding in *Nora*.  Justice Beatty merely

quoted it to emphasize that the person whose domicile was at issue in *Nora* was

"never judicially declared insane."  *Id.*  The court has found no other opinion of the

---

Of course, in this case, the Virginia Court lacked confidence in Mr. Morris and Ms. Duncan, particularly because they participated in the transfer of substantial assets from Amy to themselves while under the Virginia Court's jurisdiction and without that court's approval.  (*See* Lead Case Doc. # 35-1, at 17, ¶ 8 ("Thomas W. Morris and Sharon Duncan have acted in a manner contrary to the best interests of [Amy] . . . .").)  Mr. Morris requested the court to change Amy's legal domicile once, which was denied.  (*See* Lead Case Doc. # 35-1, at 35, ¶ 3 (denying, on December 19, 2008, a pending motion to transfer the guardianship and to change Amy's "residence").)  The Virginia Court stated that its ruling did not preclude a future change in Amy's residence by agreement of the conservator and *guardian ad litem*, or by an order of a court of competent jurisdiction.  (Lead Case Doc. # 35-1, at 35, ¶ 3.)  If Mr. Morris had requested permission again from the Virginia Court to change Amy's legal domicile, the request most likely would have been opposed by the Trust Company and denied, but at any rate, he never received permission from the Virginia Court or any other court of competent jurisdiction. Under Virginia law, as pronounced in *Kernochan*, Mr. Morris lacked authority to change Amy's domicile without the endorsement of the Virginia Court that duly declared Amy incompetent in the guardianship and conservatorship proceedings.

Alabama Supreme Court addressing the issue of whether and how the domicile of a mentally incapacitated person may be changed properly.[38]

At this court's directive, Mr. Morris has supplemented the record with documents from the Montgomery County Probate Court proceedings.[39]   In his petition to probate the 2007 Will, Mr. Morris represented to the Probate Court that Amy "was at the time of her death, an inhabitant of [Montgomery] County" who died "leaving assets in this State."  (Lead Case Doc. # 97-1, at 7.)  In the Probate Court's "Decree Admitting Will to Probate and Granting Letters Testamentary," the Probate Court identified Amy as "an inhabitant of Montgomery County" and

---

[38] The general rule set out in Corpus Juris Secundum, cited by Justice Beatty, is similar today.  It states that "[w]hether a person of partially unsound mind is precluded from establishing a domicile *depends on the degree of mental impairment*."  28 C.J.S. *Domicile* § 31 (emphasis added).  But in Amy's case, the Virginia Court decreed that her mental incapacity was "complete" and "perpetual"; Amy was never restored to competency, and there were no subsequent orders amending the February 29, 2008 decree.

The Restatement (Second) of Conflicts of Laws also addresses the issue of an incompetent person's ability to change his or her domicile.  It states that a guardian's "authority to move [an] incompetent to a new home and domicil in another state, and hence beyond the effective control of the original court, is not . . . easily inferred."  Restatement (Second) of Conflict of Laws § 23 cmt. f (1971).  "It will usually be held under these circumstances that the guardian was acting within his authority, and that the incompetent's domicil shifted to another state if this shift of domicil would be in the best interests of the incompetent and was not made to achieve some selfish purpose of the guardian."  *Id.*

Here, it could be inferred that Amy's relocation to a facility in Alabama, near her son, was in her best interests; after all, the Virginia Court ultimately permitted the move, after it was accomplished.  But it cannot be inferred that there were no selfish purposes of her guardian.  Mr. Morris benefits from the 2007 Will, and the will's legitimacy, as probated in Alabama, hinges on Amy's domicile in Alabama.

[39] Specifically, Mr. Morris was directed to furnish any transcript or order "showing the Probate Court's finding(s) in support of venue in Montgomery County, Alabama, pursuant to Alabama Code § 43-8-162."  (Lead Case Doc. # 96, at 2.)

found that the court was "satisfied as to its jurisdiction." (Lead Case Doc. # 97-1, at 11.)  The decree makes no reference to the presence of any of Amy's assets in Alabama.  (*See* Lead Case Doc. # 97-1, at 11.)  Indeed, all of Amy's substantial assets had been entrusted to the Trust Company as conservator, and those assets remained in Virginia.  Thus, the record shows that the Alabama Probate Court based its exercise of jurisdiction on Amy's status as an inhabitant of Montgomery County, per § 43-8-162(1).[40]

"[A] state court's final judgment determining *its own* jurisdiction ordinarily qualifies for full faith and credit, *so long as the jurisdictional issue was fully and fairly litigated in the court that rendered the judgment*."  *Marshall v. Marshall*, 547 U.S. 293, 314 (2006) (citing *Durfee v. Duke*, 375 U.S. 106, 111 (1963)) (second emphasis added).  Nothing in the records of the Alabama probate proceedings indicates that the Probate Court considered Amy's prior adjudication of incapacity and resulting need for a court-appointed guardian and conservator or the import of those facts upon the issue of Amy's domicile.  However, the Alabama Probate Court found that Amy had the capacity to execute the 2007 Will – otherwise, the will would not have been probated.  (*See* Lead Case Doc. # 97-1, at 11 (stating that the 2007 Will's two subscribing witnesses' written testimony

---

[40] Jurisdiction based alternatively upon § 43-8-162(2) would require a finding that Amy died in Montgomery County, Alabama, while domiciled elsewhere, "leaving assets" in Montgomery County, Alabama, but that was expressly not the finding of the Alabama Probate Court.

had been produced for the court, and finding that Amy "at the time of signing [the 2007 Will] was of full age and sound mind and disposing memory and understanding".)  Because the Probate Court found that Amy had testamentary capacity, it implicitly found that Amy had the capacity and requisite intent to establish an Alabama domicile.  But was such a finding supporting Amy's domicile in Alabama proper in view of Amy's adjudication of incapacity in Virginia and the Virginia Court's non-approval of a legal change in domicile?  The answer is no.

### 2.    *Conclusions on Full Faith and Credit*

This court concludes that Amy was not domiciled in Alabama at the time of her death because (1) as a person who had been adjudicated completely mentally incapacitated, Amy was legally incapable of changing her domicile from Virginia to Alabama, and (2) the Virginia Court which declared Amy mentally incapacitated did not approve the legal act of changing Amy's domicile from Virginia to Alabama.  For that reason, the Alabama Probate Court lacked jurisdiction to probate the 2007 Will or to exercise jurisdiction over Amy's Estate. The Virginia Court had the authority and a valid reason to deny full faith and credit to the Alabama Probate Court's decree and to proceed to probate the 1998 Will.[41]

---

[41]  In addition to its authority to consider the Alabama Probate Court's want of jurisdiction, the Virginia Court properly considered Amy's domicile anew because all of the

On similar authority and for similar reasons, this court likewise declines to attach full faith and credit to the decree and orders of the Alabama Probate Court probating the 2007 Will and appointing Mr. Morris as executor of Amy's Estate. Full faith and credit is extended to Virginia's order probating the 1998 Will and naming Ms. Loulakis as executrix of Amy's Estate, and that order is entitled to the preclusive effect that Virginia's law of res judicata affords it.

Additionally, there is authority, uncited by the parties, for attaching full faith and credit to Virginia's order instead of Alabama's order. Mr. Morris has argued that this court should recognize him because he was appointed executor first-in-time. (*See* Lead Case Doc. # 88, at 17.) However, "[w]hen conflicting state court judgments are entered in two states, each of which would otherwise be entitled to full faith and credit in federal court, it is the judgment entered last in time that must control." 50 C.J.S. *Judgments* § 1316. *See also* Restatement (Second) of Conflict of Laws § 114 (1971) ("A judgment rendered in a State . . . will not be recognized or enforced in sister States if an inconsistent, but valid, judgment is subsequently rendered in another action between the parties and if the earlier judgment is superseded by the later judgment under the local law of the State where the later judgment was rendered."); Restatement (Second) of Judgments § 15 (1982) ("When in two actions inconsistent final judgments are rendered, it is the later, not

---

parties before the Virginia Court had not been heard in the Alabama proceedings. *See Riley*, 315 U.S at 349–50, 354.

the earlier, judgment that is accorded conclusive effect in a third action under the rules of res judicata.").  This is commonly known as the "last-in-time" rule.

"This 'last-in-time' rule is based not only upon principles of comity and the need for finality, but upon the obligation of the litigants to exercise all due diligence in the full and forthright presentation of their controversy." *First Tenn.*, 766 F.2d at 259.  Although the rule's application makes the most sense where identical parties litigate the same claim or issue in successive forums, *see, e.g., Robi v. Five Platters, Inc.*, 838 F.2d 318 (9th Cir. 1988), at least one court has followed the rule even where some of the relevant parties, all joined in the third action, were absent from proceedings in either of the first or second forums, *see First Tenn.*, 766 F.2d at 259.

Like this court, a federal court in *First Tennessee* was pressed to decide "which of two consecutive and conflicting state court decisions [wa]s entitled to full faith and credit and preclusive effect in subsequent federal litigation." *Id.* at 256.  A testatrix died a domiciliary of Arkansas, leaving hundreds of acres of land in Mississippi to beneficiaries there and a sizeable amount of personal property to different beneficiaries in Arkansas.  She named First National Bank as executor.  Arkansas and Mississippi law diverged with respect to how her estate taxes should be paid (*i.e.*, from residual personalty first, with last resort to realty (Mississippi), or from all beneficiaries and property types on a pro rata basis

59

(Arkansas)).  Against the advice of counsel, the Bank proceeded to initiate primary probate proceedings in Mississippi, and later, ancillary proceedings in Arkansas. The Bank eventually petitioned the Mississippi probate court to permit the withdrawal of the will for transfer to Arkansas, but the court denied the motion, retained jurisdiction, and entered an order directing that estate taxes be paid from the testatrix's personalty.  The Mississippi Supreme Court affirmed on appeal, and the Bank paid the estate taxes.

The Arkansas beneficiaries petitioned an Arkansas probate court for a final accounting by the Bank as executor.  Once the bank submitted its accounting, the beneficiaries objected to the $229,000 sum claimed for payment of estate taxes. The Bank argued that the Arkansas court should give full faith and credit and res judicata effect to the Mississippi Supreme Court's ruling, but the Arkansas probate court rejected that argument because the Bank, in its capacity as the executor of the *Arkansas* estate, had not been a party to the Mississippi proceedings and because the corpus of the Arkansas estate was not subject to Mississippi's jurisdiction.  The Arkansas court directed that the estate be distributed according to Arkansas law, and the Bank's credit of $229,000 be denied.   The Arkansas Supreme Court affirmed, affording full faith and credit to Mississippi's ruling only as to the Mississippi real estate.  The United States Supreme Court denied a petition for certiorari.  The Bank paid a judgment with interest to the Arkansas beneficiaries.

The Bank filed an action in the United States District Court for the Western District of Tennessee, stating that it was faced with conflicting judgments of the highest courts of Mississippi and Arkansas. The Bank was, however, challenging the Arkansas ruling subjecting it to liability. As the Sixth Circuit put it, "the appellant Bank seeks a second and collateral federal review, on its claim of error by the Supreme Court of the State of Arkansas . . . , and a ruling here that the Arkansas judgment is invalid for having erroneously denied full faith and credit to a prior Mississippi judgment." *Id.* at 258. The district court denied the Bank that relief, and the Sixth Circuit affirmed the judgment of the district court.

To resolve *First Tennessee*, the Sixth Circuit relied exclusively on the "last-in-time" rule. The Bank asserted that the case was distinguishable from case precedents following the rule because the Mississippi beneficiaries were not participants in the Arkansas litigation.[42] The court answered that objection by noting that "neither were all parties present in the first forum, to which the Bank claims Arkansas erroneously failed to accord full faith and credit." *Id.* at 259. The fact remained that there were two conflicting state court judgments concerning the Bank's liability for the payment of estate taxes.

The Sixth Circuit surveyed four Supreme Court cases where the Court used the last-in-time rule and explained that "[t]he thread uniting [*First Tennessee*] with

---

[42] Similarly, in this case, all parties were before the Virginia Court's probate proceedings, but were not before the Alabama Probate Court.

the entire line of nomadic controversies which were terminated, if not resolved, by attachment of full faith and credit to the last judgment in time, is the failure of [a] dissatisfied contestant to fully litigate its position in a forum which has provided that opportunity." *Id.* The court then attributed blame to the Bank for failing to obtain jurisdiction over all interested parties before litigating issues to judgment in different states.

The principle supporting the "last-in-time" rule, as identified by the Sixth Circuit, applies in this case, too. All parties (*i.e.*, the Foundation, Ms. Loulakis, Mr. Morris, and Ms. Duncan) were joined to the Virginia probate proceedings and are bound by the Virginia Court's final orders. Mr. Morris never marshaled all the parties together in an Alabama proceeding that was tried to a final disposition in his favor. By failing to do so, he has deprived himself of the advantages of pleading res judicata in support of his authority to proceed as executor or beneficiary of Amy's Estate.

Furthermore, Mr. Morris and Ms. Duncan cannot complain about Virginia's refusal to acknowledge Mr. Morris's prior appointment as executor when he did not appeal to Virginia's Supreme Court the trial court's alleged error of not giving full faith and credit to the decree of the Alabama Probate Court. *See Treinies v. Sunshine Mining Co.*, 308 U.S. 66, 77 (1939) (applying the last-in-time rule and faulting the party who lost in the second action for not seeking full appellate state

court review of the alleged error of the second court); *see also Robi*, 838 F.2d at 323 (encouraging parties "to appeal an inconsistent judgment directly rather than attack it collaterally before another court"); *Eyber*, 249 F. Supp. at 534 (same). Mr. Morris now bears the consequences of his choices in prior litigation.

Finally, an advantage of following the last-in-time rule in a case like this one is that it "ends the chain of relitigation by stopping it where it stands after entry of the most recent court's judgment, and thereby discourages relitigation in yet another court." *Robi*, 838 F.2d at 323 (internal quotation marks and alterations omitted). Whether that advantage will be realized remains to be seen.

### 3.   *Summary*

In sum, the court declines to attach full faith and credit to any order or decree of the Alabama Probate Court recognizing the 2007 Will as Amy's last will and testament or conferring authority upon Mr. Morris to represent Amy's Estate. For that reason, Mr. Morris lacks the capacity to bring his tort claims on behalf of the Estate in the lead case against the Trust Company and the Foundation. Additionally, any defense by Mr. Morris and Ms. Duncan to the Foundation's claim to collect the $1,125,222 judgment based on Mr. Morris's status as executor or Mr. Morris and Ms. Duncan's status as beneficiaries and owners of the same judgment must be rejected.

**B.**    <u>**Lead Case Motions to Dismiss – 12(b)(6) Grounds**</u>

Even if Mr. Morris were to be recognized as the proper representative of Amy's Estate, all but one of his tort claims would fail to survive the Rule 12(b)(6) motions. The Trust Company and the Foundation offer several arguments in support of their motions to dismiss Mr. Morris's Amended Complaint. This discussion proceeds under the alternative assumption that Mr. Morris has capacity to bring claims on behalf of Amy's Estate.

    **1.**    *Abatement of Claims*

A common argument is that nearly all of Mr. Morris's claims abated upon Amy's death in 2011. (*See* Lead Case Docs. # 35, at 3–7; # 38, at 8–10.) Indeed, with few exceptions, Mr. Morris fails to raise claims that did not abate upon Amy's death. He has pleaded possibly four claims arising after Amy's death, and only three of those four claims are against the Trust Company and the Foundation: (1) Count One's claim that the Trust Company breached its fiduciary duty to the Estate by wrongfully refusing to pay the remaining $106,000 of Amy's property to Mr. Morris, upon his demand (Lead Case Doc. # 29, at ¶ 50); (2) Count Two's claim that the Trust Company converted the remaining $106,000 by incurring litigation expenses (Lead Case Doc. # 29, at ¶ 54); and (3) Count Seven's allegation that the Trust Company and Ms. Loulakis conspired to deplete the remaining $106,000 in assets in litigation expenses, in spite of their knowledge of

Mr. Morris's appointment as Executor by the Alabama Probate Court (Lead Case Doc. # 29, at ¶¶ 44–45, 82).[43]

All other alleged torts occurred during Amy's life and thus are not wrongs committed against her Estate. The Trust Company and the Foundation seek dismissal of every claim that has been extinguished by Amy's death. (*See* Lead Case Docs. # 35, at 3–7; # 38, at 8–10.) By prior order, the court informed Mr. Morris that "[w]hatever tort claims [Amy] might have had or maintained during her life died when she did." (Lead Case Doc. # 28, at 5–6 (citing Ala. Code § 6-5-462 and *Robbins v. Sanders*, 890 So. 2d 998, 1011 (Ala. 2004) (holding that tort claims not pending at the time of decedent's death are extinguished by decedent's death)).)

Nonetheless, Mr. Morris contends that Alabama law should not allow tort claims committed against Amy during her period of incompetency to abate upon her death. In support, he cites *Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041 (11th Cir. 2011), a case that actually undermines his position. There, the Eleventh Circuit found that Alabama's survivorship statute must be applied to abate § 1983 excessive force claims. *Id.* at 1050. The district

---

[43] The fourth cause of action potentially based on events following Amy's death is Count Six's allegation that Ms. Loulakis violated Alabama's Legal Services Liability Act in her actions as attorney after Amy died. (Lead Case Doc. # 29, at ¶ 74.) That claim is not discussed because this court lacks personal jurisdiction over Ms. Loulakis. The Foundation correctly notes that Mr. Morris's amended complaint does not implicate it in any conspiracy following Amy's death. (*See* Lead Case Doc. # 38, at 10–11 (citing Lead Case Doc. # 29, at ¶¶ 44–45).)

court had reached the opposite conclusion. *Id.* at 1044. Mr. Morris proposes that because *Gilliam* included a substantial dissent that agreed with the district court's ruling, it is not frivolous for him to ask this court to decline to apply Alabama's survivorship statute in this suit. (*See* Lead Case Doc. # 41, at 8–9.) He further asserts that "[t]here was a period of nearly [two] years when [Amy] had no Guardian at all and was represented only by [the Trust Company as] conservator," (Lead Case Doc. # 41, at 10), and even when Mr. Morris was her guardian, he lacked the authority to bring claims on her behalf.

Without citing any legal authority, Mr. Morris suggests that Amy's incompetency and former representation by a conservator with allegedly adverse interests to Amy's requires the court to permit untimely claims because they could not have been raised sooner. Mr. Morris argues in his first supplemental brief that the abatement statute should not be applied because only the conservator could have pursued the claims on Amy's behalf during her lifetime, against itself, which would have been futile and nonsensical. (Lead Case Doc. # 88, at 22–24.) He further likens Amy's situation to that of incompetency due to minority and asserts that the law should excuse the late filing of Amy's claims because she could not raise them during her period of incompetency.

Mr. Morris's arguments are without merit. There is no authority under *Gilliam* or any other case to shelve § 6-5-462, even where the decedent lacked

capacity to bring the suit against the tortfeasor during her lifetime.  The court is unaware of any authorities endorsing Mr. Morris's position, and he offers none.

Accordingly, Counts Three, Four, and Seven against the Foundation are therefore due to be dismissed because these claims were extinguished by Amy's death in 2011 and because Mr. Morris has alleged no tortious conduct attributable to the Foundation since Amy's death.   To the extent that Counts One, Two, and Seven implicate the Trust Company for tortious conduct during Amy's life, Counts One, Two, and Seven are likewise due to be dismissed pursuant to Alabama's survivorship statute.[44]

Remaining are the Trust Company's other defenses that are applicable to Mr. Morris's claims that arose after Amy's death.

## 2.    *Preclusive Effect of Virginia Interpleader Suit*

The Trust Company argues that "critical proceedings" in the Virginia Court and their res judicata effect preclude Mr. Morris's claims.  (Lead Case Doc. # 35, at 8.)  Regarding the allegedly wrongful conduct following Amy's death, the Trust Company claims that it instituted an interpleader action one month after Amy's death to resolve the competing claims to Amy's remaining property (*i.e.*, the $106,000) and to request that the Virginia Court retain jurisdiction over the

---

[44] Because the Trust Company's abatement of claims argument is meritorious, it is unnecessary to consider its argument that most of the breach of fiduciary tort claim is barred by a statute of limitations.  (*See* Lead Case Doc. # 35, at 13–14.)

complete administration of the conservatorship estate.  (*See* Lead Case Doc. # 9-6 (Trust Company's Am. Compl. in the interpleader suit).)   Mr. Morris actively participated in that action, filing motions to dismiss the interpleader complaint and objections to the Trust Company's Accounting.  (*See* Lead Case Docs. # 9-8, 9-9, 9-10, 9-11, 9-12.)  As discussed *supra*, the Virginia Court ruled that Ms. Loulakis was the Executor of Amy's Estate, and thus, the remainder of Amy's assets in the Trust Company's possession were to be paid to Ms. Loulakis, not Mr. Morris. After admitting evidence, ruling on objections, and holding a hearing, the Virginia Court approved the Trust Company's accountings, request for attorney's fees, and costs for administration as conservator.  (*See* Lead Case Doc. # 35-2.)[45]  The Trust Company reiterates its stance in its first supplemental brief.  (Lead Case Doc. # 87, at 6–8.)

In response to the Trust Company's argument in favor of res judicata, Mr. Morris argues that his opponents request the court to apply only Virginia's rulings in the Trust Company's favor but not Alabama's orders in his favor.  (Lead Case Doc. # 41, at 5.)  But there is no competing Alabama court judgment finding that the Trust Company improperly distributed the remainder of Amy's property to Ms.

---

[45] The Trust Company also represents that Mr. Morris was an interested party to its "Petition for Aid and Guidance" concerning the sale of Amy's home in 2010.  There is no need to explore the preclusive effect of any ruling arising from that petition because any cause of action arising from the sale of Amy's home has abated pursuant to Alabama law.  *See supra* Section IV.B.1.

Loulakis, mismanaged the administration of the conservatorship estate after Amy's death, or converted property for its own litigation and administrative expenses. Identifying an Alabama court that acknowledges Mr. Morris as Executor of Amy's Estate is not enough.  The similar action in Alabama Probate Court to compel the Trust Company to transfer conservatorship property to Mr. Morris ended in the Trust Company's favor when the Alabama Supreme Court required the Alabama Probate Court to vacate its order.  *See Ex parte Trust Co. of Va.*, 96 So. 3d at 69. There is no Alabama judgment on the issue of the Trust Company's management of the conservatorship property upon which to apply res judicata principles.

Mr. Morris further argues that res judicata is inapplicable because the parties in the Virginia interpleader proceedings are not substantially identical to the parties before this court.  That is, Mr. Morris acknowledges that he sues as the Executor of Amy's Estate in this litigation, but that he was not involved in the relevant Virginia Court proceedings in that capacity.  That is simply not true with respect to the interpleader suit.  The Trust Company filed the interpleader action after Amy's death to resolve "competing claims to the conservatorship estate" by "different persons and entities . . . purporting to be [Amy's] successor in interest . . . ." (Lead Case Doc. # 35-2, at 5, ¶¶ I–J.)  Mr. Morris litigated in that interpleader action under the authority granted by the Alabama probate court to act as Amy's personal representative.  Even if Virginia declined to credit Mr. Morris's authority to litigate

as the executor, it acknowledged the fact that the Alabama Probate Court had acted.

Although Mr. Morris's objections to res judicata are without merit, the discussion is not over.  When deciding whether to give res judicata effect to a state court judgment, federal courts apply the law of the state from which the judgment emerged.  *Kremer*, 456 U.S. at 482; *Allen v. McCurry*, 449 U.S. 90, 96 (1980).  Hence, Virginia law applies.[46]  Virginia's res judicata doctrine has been formalized as a rule that became effective for all Virginia judgments entered in civil actions commenced after July 1, 2006.  It states:

> A party whose claim for relief arising from identified conduct, a transaction, or an occurrence, is decided on the merits by a final judgment, shall be forever barred from prosecuting any second or subsequent civil action against the same opposing party or parties on any claim or cause of action that arises from that same conduct, transaction or occurrence, whether or not the legal theory or rights asserted in the second or subsequent action were raised in the prior lawsuit, and regardless of the legal elements or the evidence upon which any claims in the prior proceeding depended, or the particular remedies sought.

*Caperton v. A.T. Massey Coal Co.*, 740 S.E.2d 1, 8 n.3 (Va. 2013) (quoting Va. Sup. Ct. R. 1:6(a)).  Rule 1:6 is a broad "transactional test" meant to supplant Virginia's previous adherence to a more narrow "same evidence test."  *Va. Imports, Ltd. v. Kirin Brewery of Am., LLC*, 650 S.E.2d 554, 561 n.6 (Va. Ct. App.

---

[46] It is noted, however, that the Trust Company cites Alabama law on res judicata in its supplemental brief.  (Lead Case Doc. # 87, at 8 (citing *Lott v. Toomey*, 477 So. 2d 316, 319 (Ala. 1985)).)

2007); *see also Rhoten v. Commonwealth*, 750 S.E.2d 110, 113–14 (Va. 2013). Under either standard, the "effect of a final decree is not only to conclude the parties as to every question actually raised and decided, but as to every claim which properly belonged to the subject of litigation and which the parties, by the exercise of reasonable diligence, might have raised at the time." *Va. Imports*, 650 S.E.2d at 561 n.6 (quoting *Smith v. Holland*, 98 S.E. 676, 676 (Va. 1919) (emphasis omitted)).

Applying Rule 1:6, there was a prior judgment on the merits rendered by a court of competent jurisdiction in the Virginia interpleader case, and the identity of the same parties has been noted. The remaining question is whether the Trust Company demonstrates that Mr. Morris's causes of action might have been litigated in the Virginia interpleader suit.[47] Mr. Morris could have asserted breach of fiduciary duty, conversion, and civil conspiracy as counterclaims against the Trust Company at that time.

In its original briefing, (Lead Case Doc. # 35, at 12), the Trust Company cites *Winchester Neurological Consultants, Inc. v. Landrio*, 74 Va. Cir. 480 (Va. Cir. Ct. Jan. 30, 2008), for its proposition that res judicata bars "issues that could have been litigated, might have been litigated, or should have been litigated" in an

---

[47] Mr. Morris did not raise tort claims against the Trust Company in the Virginia interpleader suit; he merely asserted objections and arguments in support of dismissal of the interpleader complaint. (*See* Lead Case Docs. # 9-8, 9-9, 9-10, 9-11, 9-12.)

earlier proceeding. *Id.* at *3. One might assume that "could have," "might have," or "should have" would cover Mr. Morris's claims. But the *Winchester* opinion recognizes that "Virginia does not have mandatory counterclaims," and thus, there is an "exception to the bar of res judicata." *Id.* at *7. The *Winchester* court advised plainly that "the failure to assert a counterclaim does not bar a later action on the counterclaim." *Id.* (citing Restatement (Second) of Judgments § 22; 47 Am. Jur. 2d *Judgments* § 504); *see also Gray Diversified Asset Mgmt., Inc.*, 77 Va. Cir. 187, at *2 (Va. Cir. Ct. Oct. 7, 2008). Hence, Mr. Morris arguably could have made a counterclaim in the interpleader suit in Virginia, but he did not have to do so.

Therefore, following Virginia law, the Trust Company is not entitled to the benefit of res judicata as a defense to any unabated tort claims because those claims did not have to be litigated by Mr. Morris in the Virginia interpleader suit. The Virginia Court's approval of the Trust Company's management of the conservatorship assets and entitlement to attorney's fees does not preclude Mr. Morris from bringing his related claims for breach of fiduciary duty, conversion, and conspiracy.

### 3.    *Failure to State Claims Against Amy's Estate*

The Trust Company also argues for dismissal under Rule 12(b)(6) based on Mr. Morris's failure to plead claims upon which relief can be granted.

### a.    Count One – Breach of Fiduciary Duty

The Trust Company argues that its refusal to pay conservatorship funds to Mr. Morris and its decision to file the Virginia interpleader action after Amy's death cannot be deemed tortious conduct because the Trust Company had no choice but to seek a judicial resolution of competing claims for the $106,000, and because it acted according to its authority as the court-appointed conservator under Virginia law.   The Trust Company asserts that the amended complaint fails to allege how its refusal to disburse funds to Mr. Morris, in view of competing probate proceedings, amounts to a breach of duty owed to the Estate, or further, how interpleading conservatorship funds could constitute conversion.   (*See* Lead Case Doc. # 35, at 14–17.)[48]   The elements of breach of fiduciary duty are (1) a relationship establishing a fiduciary duty owed to the plaintiff, (2) a breach of the duty, and (3) damages.   *Regions Bank v. Lowrey*, 101 So. 3d 210, 219 (Ala. 2012).

The amended complaint alleges that the Trust Company "refused to relinquish [Amy's E]state's funds" and threatened to "consume the remaining $106,000 in litigation" unless Mr. Morris and Ms. Duncan released their personal claims against the Trust Company.   (Lead Case Doc. # 29, at ¶¶ 44–45; 50.)   It also alleges that the Trust Company "paid Karen Loulakis a portion of the remaining

---

[48] Mr. Morris makes no response to these specific arguments.   Nonetheless, with the Trust Company's arguments in mind, the court reviews the allegations in the amended complaint to see whether there are facts plausibly supporting cognizable tort claims in Counts One and Two.   *See Boyd v. Peet*, 249 F. App'x 155, 157 (11th Cir. 2007).

$106,000, perhaps $16,000 . . . ."  (Lead Case Doc. # 29, at ¶ 45.)  The reason for that $16,000 payment to Ms. Loulakis is not clearly pleaded, but it appears that Mr. Morris is referring to the amount left in the Estate after the payment of fees to attorneys and to the Trust Company as conservator.  (*See* Lead Case Doc. # 35-2, at 12, ¶ G (directing the Trust Company to "pay over and deliver the judgment and all remaining assets of the conservatorship estate to [Ms.] Loulakis. . . .").)

It was not unlawful for the Trust Company to initiate the interpleader action in response to competing claims to the remainder of the conservatorship estate. But Mr. Morris has alleged that the Trust Company put its own interests ahead of the Estate's by threatening to litigate and consume the property through incurring legal expenses if Mr. Morris and Ms. Duncan did not "release[ ] their personal claims" against the Trust Company.  (Lead Case Doc. # 29 at ¶ 44, 50.)  The breach of fiduciary duty claim is not based on the filing of the interpleader litigation by itself, as the Trust Company asserts, but on the threat of filing litigation and consuming assets in litigation if personal claims were not forfeited. At the motion-to-dismiss stage, the court is obligated to accept factual allegations as true.  The amended complaint sets out allegations that, if proven to be true, may entitle the Estate to relief for breach of fiduciary duty.  The Trust Company's motion to dismiss the remnant of Count One on Rule 12(b)(6) grounds would be due to be denied, but the court's decision to decline full faith and credit to

Alabama's Probate Court orders prevents Mr. Morris from proceeding with this claim.

### b.     Count Two – Conversion

The Trust Company similarly argues that "because [it] interpled [Amy's] assets in the Virginia [C]ourt in accordance with its duties as conservator, it cannot be found to have wrongfully converted those funds." (Lead Case Doc. # 35, at 17.) Conversion requires a showing that defendant wrongfully took, wrongfully detained, interfered with, illegally assumed ownership over, illegally used, or misused property "in exclusion or defiance of a plaintiff's rights, where [the] plaintiff has general or specific title to the property or the immediate right to possession." *Ott v. Fox*, 362 So. 2d 836, 839 (Ala. 1978). The Trust Company argues that its interpleading the funds was not a wrongful detention or misuse of assets, and neither was its receipt of court-sanctioned attorney's fees and costs a misappropriation of the Estate's property. Again, Mr. Morris has not responded to these specific contentions.

Looking to the pleading, Mr. Morris alleges that the Trust Company "used [Amy's] assets to fund extensive litigation." (Lead Case Doc. # 29, at ¶ 52.) Absent the Trust Company's use of the funds, these assets "would otherwise have been a portion of the [E]state." (Lead Case Doc. # 29, at ¶¶ 53–54.) Count Two also incorporates by reference facts alleged in Count One, and specifically

paragraph 50.  Paragraph 50, in turn, cites paragraphs 44 and 45.  It thus appears that the gist of Count Two is that the Trust Company litigated and thereby "spent the rest [of the money] on its lawyers."  (Lead Case Doc. # 29, at ¶ 45.)

However, absent any allegation that the Trust Company appropriated, on its own initiative, some or all of the $106,000 for its own benefit, Mr. Morris's claim for relief for conversion is not plausible on its face.  The interpleader of the Estate's funds may have been contrary to Mr. Morris's wishes, but it was not wrongful or illegal.  Further, the Trust Company did not misuse the Estate's funds when the Virginia Court awarded attorney's fees and administrative expenses and directed the Trust Company to pay the fees and costs from Amy's property.  (*See* Lead Case Doc. # 35-2, at 6–9.)  Mr. Morris's conversion claim is thus baseless, and the Trust Company's Rule 12(b)(6) motion to dismiss what remains of Count Two is due to be granted.

### c.    Count Seven – Conspiracy

The Trust Company asserts that under Alabama law, civil conspiracy is not an independent cause of action, and because Mr. Morris's other underlying tort claims fail, so also, Count Seven must fail.  (Lead Case Doc. # 35, at 18–19.)  Mr. Morris has not rebutted this argument.

The Trust Company's position, of course, does not account for the potential, surviving tort claim for breach of fiduciary duty.  Nevertheless, the amended

complaint contains no allegations connecting Ms. Loulakis or the Foundation to the Trust Company's alleged tortious act of threatening to deplete conservatorship estate funds if Mr. Morris and Ms. Duncan refused to release any personal claims against the Trust Company.  A civil conspiracy necessarily involves more than one actor.  *See Eidson v. Olin Corp.*, 527 So. 2d 1283, 1285 (Ala. 1988) ("Civil conspiracy is a combination of two or more persons . . . .").  Hence, the remaining fraction of Mr. Morris's underlying breach of fiduciary duty tort claim is insufficient to function as the requisite tort supporting the civil conspiracy.  *See Funliner of Ala., L.L.C. v. Pickard*, 873 So. 2d 198, 211 (Ala. 2003) ("A civil conspiracy is not an independent cause of action.").   Accordingly, the Trust Company's motion to dismiss Count Seven for failure to state a claim is due to be granted.

### 4.    *Summary on Motions to Dismiss*

If this court were to recognize Mr. Morris as having the capacity to sue on behalf of Amy's Estate, the only unabated, cognizable tort claim that would survive the motions to dismiss would be the claim that the Trust Company breached its fiduciary duties by allegedly bargaining with Mr. Morris over the $106,000 remaining in the Estate after Amy died.   However, the court has concluded that the breach of fiduciary duty claim is due to be dismissed on the threshold defense of Mr. Morris's lack of capacity to sue on behalf of Amy's

Estate.  The Foundation and the Trust Company's motions to dismiss are due to be granted.

## C.   Member Case Motions for Summary Judgment

### 1.   *Cross Motions for Summary Judgment on the Foundation's Claims*

The Foundation and Mr. Morris and Ms. Duncan have submitted cross motions for summary judgment on Counts I and II of the Foundation's amended complaint.  In Count I, the Foundation seeks to collect the $100,000 monetary judgment imposed by the Virginia Court against Mr. Morris and Ms. Duncan and in favor of the Foundation for its attorney's fees and costs attributable to Mr. Morris and Ms. Duncan's contempt of court orders.  In Count II, the Foundation seeks to collect the $1,125,222 monetary judgment entered by the Virginia Court against Mr. Morris and Ms. Duncan and in favor of Amy, which became an asset of Amy's Estate that Ms. Loulakis assigned to the Foundation as beneficiary of the Estate.

The Foundation asserts that there is no genuine dispute that:  (1) the Virginia Court entered two monetary judgments in the amounts of $100,000 and $1,125,222 against Mr. Morris and Ms. Duncan; (2) Mr. Morris and Ms. Duncan were afforded no relief from these judgments on appeal; and (3) the judgments have not been satisfied.  (*See* Member Case Doc. # 52-9, 52-10 (Affidavits of David A. Roe, President of the Foundation, and William M. Hutchins, Trust Officer for the Trust

Company).)   The Foundation further argues that principles of preclusion law support the entry of summary judgment.  (*See* Member Case Doc. # 52, at 8 (citing Restatement (Second) of Judgments § 17 ("If the judgment is in favor of the plaintiff, the claim is extinguished and merged in the judgment and a new claim may arise on the judgment."); Restatement (Second) of Judgments § 18(2) ("In an action upon the judgment, the defendant cannot avail himself of defenses he might have interposed, or did interpose, in the first action.").)  The Foundation urges the court to give preclusive effect to each of the Virginia Court judgments.

Virginia's law of claim and issue preclusion applies to judgments rendered by Virginia's courts, *see Kremer*, 456 U.S. at 482, and Virginia law requires this court to give res judicata effect to the Virginia Court's judgments against Mr. Morris and Ms. Duncan.

> When [a] second suit is between the same parties as the first, and on the same cause of action, the judgment in the former is conclusive of the latter, not only as to every question which was decided, but also as to every other matter which the parties might have litigated and had determined, within the issues as they were made or tendered by the pleadings, or as incident to or essentially connected with the subject matter of the litigation, whether the same, as a matter of fact, were or were not considered.

*Lofton Ridge, LLC v. Norfolk S. Ry. Co.*, 601 S.E.2d 648, 650 (Va. 2004).  *Lofton* describes the "'could-have-litigated-should-have-litigated" requirement discussed *supra* in Part IV.B.2.  *See Brock v. Voith Siemens Hydro Power Generation*, 716 S.E.2d 485, 488 (Va. 2011); *see also* Va. Sup. Ct. R. 1:6(a).  Issue preclusion, or

collateral estoppel, bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to [a] prior judgment, even if the issue recurs in the context of a different claim." *Brock*, 716 S.E.2d at 487 (internal quotation marks and citation omitted).

Despite Mr. Morris and Ms. Duncan's contentions to the contrary, the Virginia Court had jurisdiction over the guardianship and conservatorship proceedings, and later, the interpleader and probate proceedings. Further, Mr. Morris and Ms. Duncan cannot dispute that they, along with the Foundation, were parties to those actions, which resulted in a final judgment against them on December 18, 2008, and a final probate decree on August 12, 2011 – neither of which was disturbed by a direct appeal. Hence, res judicata doctrine bars all of Mr. Morris and Ms. Duncan's defenses that were raised or that could have been raised in the litigation before the Virginia Court.

### 2. *Opposition to Summary Judgment on the Foundation's Claims*

Nevertheless, Mr. Morris and Ms. Duncan raise objections to the entry of summary judgment in favor of the Foundation on Counts I and II, all of which arise based on matters independent of the Virginia Court proceedings. (*See* Member Case Docs. # 48, 60.)

### a.   Conflicting Orders

Mr. Morris and Ms. Duncan insist that conflicting probate orders prohibit the Foundation from collecting on the judgment.  (Member Case Doc. # 60, at 2.)  Mr. Morris and Ms. Duncan contend that Mr. Morris, not Ms. Loulakis, is the Executor of Amy's Estate, that they, not the Foundation, are beneficiaries of Amy's Estate, and therefore, that the Foundation has no right to enforce the $1,125,222 judgment. However, in accordance with this court's conclusion concerning full faith and credit, *see supra* Part IV.A., the conflicting probate orders are resolved in favor of the Virginia probate proceedings and the decree of the Alabama Probate Court is not afforded full faith and credit.

### b.   Res Judicata Effect of Dismissal of the Montgomery County Circuit Court Suit

Mr. Morris asserts that an action to domesticate the $1,125,222 judgment in Alabama, to which the Foundation was joined as an "indispensable party," (*see* Member Case Doc. # 55-5) terminated in his favor and was not appealed.  (*See* Member Case Doc. # 60, at ¶¶ 1–2 (citing a "Circuit Court" order dismissing an action to domesticate the $1,125,222 judgment).)   Additionally, in their counterclaim pleading, Mr. Morris and Ms. Duncan assert that this same Montgomery County Circuit Court order also dismissed the Foundation's attempt to domesticate the $100,000 judgment. (Member Case Doc. # 49, at 28, ¶ 73.)  Mr.

Morris and Ms. Duncan reference the following order signed by Circuit Judge

William Shashy on June 23, 2011:

> On May 3, 2011 came the parties, The Trust Company of
> Virginia, conservator, Thomas W. Morris, Sharon L. Duncan, and
> George Mason University Foundation, Inc., by their respective
> counsel, and it appearing to the Court that this case was initiated by
> The Trust Company of Virginia as conservator for Amy Falcon
> Morris to domesticate and enforce a judgment rendered in favor of
> Amy Falcon Morris; that Amy Falcon Morris died on March 27, 2011;
> that as a result of the death of Amy Falcon Morris, further
> proceedings in this case are unnecessary.
>
> It therefore is ORDERED that any order not otherwise ruled
> upon is DENIED and this case is hereby dismissed, costs taxed as
> paid.

(Member Case Doc. # 55-6.)

Judge Shashy's order does not foreclose the Foundation's claims in this

action.  First, the order makes no reference to any action to domesticate the

$100,000 judgment in favor of the Foundation, which is distinct from the larger

judgment in favor of Amy.  Second, the language of the order reflects that the

Trust Company's action to domesticate the $1,125,222 judgment did not terminate

upon a final judgment on the merits of any claim or defense.  Rather, the case

terminated because Amy died, rendering "further proceedings . . . unnecessary."

(Member Case Doc. # 55-6.)   There was no ruling for or against any party.

Additionally, the Eastern District of Virginia already rejected Mr. Morris and Ms.

Duncan's argument when they raised it in their motion to dismiss the Foundation's

Amended Complaint.  (*See* Member Case Doc. # 58, at 12 ("Defendants . . . have not proffered any evidence conclusively showing that the Alabama Circuit Court decided the case on the merits.").)   For these reasons, Mr. Morris and Ms. Duncan's res judicata reliance on Judge Shashy's order is unavailing.

### c.    Satisfaction of the Judgment in favor of Amy

Mr. Morris and Ms. Duncan also argue that the $1,125,222 judgment has been satisfied in both Alabama and Maryland and that they each have been released from any obligation to pay it.

### i.    Purported Alabama Satisfaction

On September 21, 2010, Mr. Morris, acting as Amy's "attorney-in-fact," filed a "Satisfaction of Judgment" with the Montgomery County Circuit Court and recorded a "Cancellation and Release" with the Montgomery County Probate Court releasing himself from liability for the judgment previously recorded in Alabama.  (Member Case Doc. # 55-1, at 2–4.)  Mr. Morris and Ms. Duncan claim that the Satisfaction of Judgment was "upheld by court Order," (Member Case Doc. # 60, at 5), but they do not clearly identify an order upholding or otherwise validating the satisfaction of judgment.   Their counterclaim sheds some light, alleging that the Foundation filed a motion to strike the purported satisfaction in the Montgomery County Circuit Court action to domesticate the judgment, discussed *supra*.  (*See* Member Case Doc. # 49, at 28, ¶ 73.)  Mr. Morris and Ms.

Duncan's counterclaim suggests, but does not aver with clarity, that the motion to strike the satisfaction was denied by Judge Shashy as an outstanding pending motion when the entire domestication suit was dismissed after Amy's death.  If that is the case, Judge Shashy's order did not rule on the motion to strike.

### ii.    Purported Maryland Satisfaction

On July 29, 2011, after Mr. Morris was granted letters testamentary in Alabama, Mr. Morris filed a "Satisfaction of Judgment" in the Circuit Court for Harford County, Maryland stating that the judgment indexed there against Ms. Duncan and him was "fully waived and considered satisfied." (Member Case Doc. # 55-1, at 6.)  The Clerk of the Circuit Court for Harford County entered a "Notice of Modification of Judgment" on August 2, 2011, acknowledging that the judgment had been satisfied.  (Member Case Doc. # 55-1, at 7.)  The case number identified on Member Case Document 55-1 is that of the Maryland case that the parties represent has been stayed pending a resolution to these proceedings.  (*See* Lead Case Docs. # 52, 55, 56.)  However, Mr. Morris and Ms. Duncan represent that the Trust Company "ultimately managed to reverse the satisfaction of judgment entered in Ms. Duncan's favor." (Lead Case Doc. # 52, at 3.)

### iii.    Satisfaction Not a Defense

The Foundation generally asserts that the satisfactions of judgment filed in Alabama and Maryland courts by Mr. Morris are fraudulent.  (Member Case Doc.

84

# 52, at 2.)   It contends that Mr. Morris and Ms. Duncan's reliance on these satisfactions is premised on Mr. Morris's authority to act as executor, and that res judicata and collateral estoppel bar him from being recognized in that capacity. (Member Case Doc. # 52, at 10.)   Actually, the satisfaction filed in Alabama depends on Mr. Morris's authority as Amy's attorney-in-fact, and the satisfaction filed in Maryland depends on his authority as executor.

Mr. Morris lacked authority to act as Amy's attorney in fact in 2010.   Amy had been adjudicated incapacitated and lacked the capacity to authorize Mr. Morris to act on her behalf by power of attorney, and any prior powers of attorney had been "revoked completely and permanently" by the Virginia Court on February 29, 2008.   (*See* Lead Case Doc. # 35-1, at 20–21, ¶¶ L, O.)   Moreover, the judgment was technically Amy's property and was under the administration of her conservator.   The Trust Company did not authorize the filing of the purported satisfaction.   Hence, the satisfaction and release filed in Alabama are invalid.

With respect to the satisfaction and release filed in Maryland in 2011, this court has declined to recognize Mr. Morris's capacity to act as executor due to the Alabama Probate Court's lack of jurisdiction over Amy's Estate.   The court therefore declines to recognize the satisfaction of judgment filed in Maryland as having any legal effect.   Moreover, by Mr. Morris and Ms. Duncan's admission,

the Maryland satisfaction was "reversed."  In sum, satisfaction is no defense to the Foundation's claims.

### d.     Judgment Not a Reported Asset of the Estate

Mr. Morris and Ms. Duncan assert that Ms. Loulakis did not report the judgment as an asset of Amy's Estate when Ms. Loulakis filed a probate tax return on August 12, 2011.  (Member Case Doc. # 55-3).  Document 55-3 is a form entitled "Probate Tax Return: Fiduciary Appointment," signed by Ms. Loulakis, as Executrix, and filed with the Virginia Beach Circuit Court Clerk's Office.  It states that the value of Amy's probate estate was $100,000 in personal property.  Even if an uncollected $1,125,222 judgment was supposed to have been reported on the form – and it is not clear that it should have been – that is no defense to the Foundation's effort to enforce the judgment against Mr. Morris and Ms. Duncan now.

### e.     Statute of Limitations Defense

In the concluding paragraph of their relatively simple *pro se* motion, Mr. Morris and Ms. Duncan request summary judgment in their favor on the basis of "applicable statutes of limitation and repose."  (Member Case Doc. # 48, at 3–4.) There is no substantive argument in Member Case Documents 48 or 60 in support of a statute of limitations defense, and further, Alabama law does not support such a defense.  *See Davis Int'l, Inc. ex rel. Patel v. Berryman*, 730 So. 2d 242, 244

(Ala. Civ. App. 1999) ("The statute of limitations for reviving a judgment is 20 years from the date the judgment was entered.").

### 3.   *Conclusions on the Foundation's Claims*

In sum, Mr. Morris and Ms. Duncan fail to persuade that the judgment entered against them by the Virginia Court is unenforceable or that there is any other reason that they are entitled to summary judgment.  The Foundation has met its burden under Rule 56 and is entitled to summary judgment on Counts I and II of its Amended Complaint in the member case.[49]

### 4.   *Cross Motions for Summary Judgment on Mr. Morris and Ms. Duncan's Counterclaims*

The Foundation and Mr. Morris and Ms. Duncan have submitted cross motions for summary judgment on Mr. Morris and Ms. Duncan's counterclaims against the Foundation (Counts III, VI, VII, VIII, IX, and X).  (*See* Member Case Docs. # 52, 60.)  Document 48 contains only Mr. Morris and Ms. Duncan's motion for summary judgment on the Foundation's claims, but Mr. Morris and Ms. Duncan's response in opposition to the Foundation's motion for summary judgment includes a cross motion for summary judgment on their counterclaims.

---

[49] The Foundation's motion for summary judgment was submitted before the Eastern District of Virginia nearly eighteen months ago.  At the time the motion was filed, the Foundation represented that the amount owed on the outstanding judgments, including post-judgment interest owed through October 3, 2013, was $1,574,851.34.  (Member Case Doc. # 52, at 16.)  The Foundation will be directed to update its demand for judgment prior to the court's entry of final judgment.

(*See* Member Case Doc. # 60, at 5–6 (requesting a joint and several monetary judgment against the Foundation, Ms. Loulakis, and the Trust Company).) However, Mr. Morris and Ms. Duncan do not meet their burden under Rule 56(a) as movants, and their cross motion for summary judgment on their counterclaims is due to be denied for that reason alone.

On the other side, the Foundation argues that Mr. Morris and Ms. Duncan's counterclaims "all rely on the central legal contention that [Mr. Morris and Ms. Duncan] are the proper beneficiaries of Ms. Morris's Estate pursuant to the 2007 Will," but Mr. Morris and Ms. Duncan "are barred by the doctrines of res judicata and collateral estoppel from asserting any such rights" as "purported beneficiaries" under the 2007 Will.  (Member Case Doc. # 52, at 15–16.)[50]

Upon review of Mr. Morris and Ms. Duncan's personal counterclaims against the Foundation, it is clear that none can survive summary judgment.  First, most of the complained-of conduct[51] has been overseen and sanctioned by order of

---

[50] The Foundation also opposes the counterclaims as untimely asserted, but does not cite a scheduling order or other rule from the Eastern District of Virginia to support the objection. No other defenses to the counterclaims have been argued, although many others (*e.g.*, lack of standing, failure to state a claim, etc.) could be conceived.

[51] Specifically, the Foundation's individual or concerted actions to "defraud" Mr. Morris and Ms. Duncan through the instigation or continuation of litigation, to seize Amy's assets, to halt the sale of Amy's home, to assist the Trust Company in "covering up" the allegedly inept handling of Amy's resources, to waste Amy's assets through litigation expense, and to disregard the Alabama's Probate Court's orders appointing Mr. Morris as executor by pursuing or participating in the Virginia probate proceeding and this litigation to collect the unpaid judgments.  (*See generally* Member Case Doc. # 49 (Counterclaims).)

the Virginia Court in various prior proceedings for conservatorship during Amy's life and for interpleader and probate after Amy's death.  For instance, the Virginia Court permitted the Foundation's intervention, directed the payment of the Foundation's litigation expenses from Amy's assets, and approved the Trust Company's management of the conservatorship estate.  These prior proceedings included the Foundation, Mr. Morris, and Ms. Duncan as parties and culminated in final decrees, orders, or judgments to which Mr. Morris and Ms. Duncan had the opportunity to object and to appeal.  Consequently, Mr. Morris and Ms. Duncan's counterclaims are mostly predicated on allegations that are precluded by the doctrine of collateral estoppel.  *See Whitley v. Commonwealth*, 538 S.E.2d 296, 299 (Va. 2000) (requiring a defendant pleading collateral estoppel to prove that "(1) the parties to the two proceedings [are] the same; (2) the factual issue sought to be litigated [was] actually litigated in the prior proceeding; (3) the factual issue [was] essential to the judgment rendered in the prior proceeding; and (4) the prior proceeding . . . resulted in a valid, final judgment against the party to whom the doctrine is sought to be applied").

Second and more significantly, the Foundation is correct that each of Mr. Morris and Ms. Duncan's counterclaims presumes this court's recognition of their status as beneficiaries under the 2007 Will and their personal interest in Amy's

Estate, but this court joins the Virginia Court in declining to give full faith and credit to the Alabama Probate Court's probate of the 2007 Will.  Because the court gives full faith and credit and res judicata effect to the order of the Virginia Court probating the 1998 Will, the Foundation is entitled to summary judgment on all of the counterclaims.

## V.  CONCLUSION

In accordance with the foregoing analysis, it is ORDERED that:

(1)    Full faith and credit is GRANTED to the order and decree of the Circuit Court of Virginia Beach, Virginia, adjudging the 1998 Will of Amy Falcon Morris to be her last will and testament and recognizing Karen Loulakis as executrix of Amy's Estate;

(2)    Full faith and credit is GRANTED to the monetary judgments of the Circuit Court of Virginia Beach, Virginia, entered against Thomas Morris and Sharon Duncan, jointly and severally, and in favor of Amy Falcon Morris ($1,125,222) and George Mason University Foundation, Inc. ($100,000);

(3)    Full faith and credit is DENIED to the order and decree of the Probate Court of Montgomery County, Alabama, adjudging the 2007 Will of Amy Falcon Morris to be her last will and testament and appointing Thomas W. Morris, as personal representative of Amy's Estate;

(4)     The Trust Company's and the Foundation's motions to dismiss Mr.

Morris's amended complaint in the lead case (Lead Case Docs. # 34,

37) are GRANTED for all of the reasons set out in this opinion;

(5)     The Foundation's cross motion for summary judgment in the member

case (Member Case Doc. # 51) is GRANTED; and

(6)     Mr. Morris and Ms. Duncan's cross motions for summary judgment in

the member case (Member Case Docs. # 48, 60) are DENIED;

It is further ORDERED that the Foundation is DIRECTED to file, on or

before **April 7, 2015**, a current calculation of principal and interest owed by Mr.

Morris and Ms. Duncan on the unpaid Virginia judgments.

An appropriate final judgment will be entered separately.

DONE this 31st day of March, 2015.

_____
                    /s/ W. Keith Watkins
                  CHIEF UNITED STATES DISTRICT JUDGE